**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **JUSTIN SILVERMAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 2:16-cv-3686-RMG** |
| ) | |
| **NATIONAL BOARD OF MEDICAL** ) | |
| **EXAMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**NBME'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65 and Local Civil Rule 7.06 DSC, defendant National Board of Medical Examiners ("NBME") respectfully files this brief in opposition to plaintiff's motion for a preliminary injunction (ECF No. 6).

NBME is concurrently filing a motion to dismiss Mr. Silverman's complaint for lack of personal jurisdiction. As noted in the brief filed by NBME in support of that motion, there is no basis for the Court to exercise general or specific jurisdiction over NBME with respect to Mr. Silverman's claims. If the Court agrees, it will not need to reach the merits of Mr. Silverman's pending preliminary injunction motion.

If the Court does address Mr. Silverman's motion for a preliminary injunction, the motion should be denied. Mr. Silverman is seeking a *mandatory* preliminary injunction that would provide him with all of the substantive relief to which he would be entitled if he were to prevail on the merits. He has not shown any factual or legal basis for awarding him such extraordinary relief.

27740597.1

## NATURE OF THE CASE

Plaintiff Justin Silverman is a graduate of Skidmore College. *See* Complaint Ex. 1 at 23, 28.[1]  He entered medical school in 2011 but is currently classified as a second-year medical student. *Id.* at 24.  He claims that he is entitled to extra testing time and other accommodations on Step 1 of the United States Medical Licensing Examination ("USMLE") because he has been diagnosed with a reading disorder and attention deficit hyper-activity disorder ("ADHD").  Pl.'s Mem. in Supp. of Mot. for Prel. Inj. (ECF No. 6-1) ("Pl. Br."), at 4-5.[2]

NBME denies that Mr. Silverman is entitled to any accommodations on Step 1 of the USMLE.  Reading disorders and ADHD are lifelong impairments with childhood onset.  Mr. Silverman, however, has presented no objective evidence that he struggled with reading or learning during his formative years.  There also is no credible objective evidence that Mr. Silverman has any current functional impairments.  To the contrary, although he claims that his diagnosed disorders limit his ability to take the Step 1 examination under standard time conditions, he has taken other highly competitive, timed, standardized tests without any accommodations and achieved extremely high scores.  He is not substantially limited in any major life activity as compared to most people in the general population, and he does not need extra testing time or any other accommodations in order to access Step 1 of the USMLE.[3]

---

[1] Complaint Ex. 1 contains the material Mr. Silverman submitted to NBME in support of his request for accommodations.  *See* Aff. of Justin R. Silverman ("Silverman Aff.") (ECF No. 6-2), ¶¶ 2-3.

[2] Mr. Silverman also has been diagnosed with an anxiety disorder and a mathematics disorder, but his request for accommodations on the USMLE were not based on these diagnoses.  *See* Complaint Ex. 1 at 1 (Personal Statement); *id.* at 30 and 37 (accommodation requests).

[3] In his preliminary injunction motion, Mr. Silverman seeks a "reduced distraction test environment" along with extended time (time and ½) on the test.  *See* Pl. Mot. for Pre. Inj. at 1; Pl. Br. at 1.  He did not seek a "reduced distraction test environment" in his prior requests for

## BACKGROUND

### I.    NBME and the USMLE

NBME is a non-profit organization.  *See* Decl. of Catherine Farmer, Psy.D. ("Farmer Decl.") ¶ 3.  In conjunction with the Federation of State Medical Boards, another non-profit entity, NBME sponsors the USMLE program.  *Id.* ¶ 4.  Jurisdictions across the country rely upon the USMLE as part of their licensure process for ensuring the qualifications of prospective physicians.  *Id.* ¶ 5.

The USMLE Step exams are standardized exams.  With limited exceptions, all examinees take the USMLE Step 1 under the same testing conditions, including standard testing time.  The primary exception is for disabled individuals who need accommodations.  *Id.* ¶¶ 4, 6, 7.

NBME conscientiously evaluates each accommodation request.  It does so to ensure that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the ... examination."  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004); *see also* Farmer Decl. ¶ 8.

### II.    Mr. Silverman's Request for Accommodations on the USMLE Step 1

Mr. Silverman submitted his most recent request for accommodations on the Step 1 exam in March 2016.  *See* Farmer Decl. ¶ 11.  His registration for the test was not complete, however, until May 2016.  *Id.*  NBME also had to request certain score-report material that was missing from the evaluation report prepared by Mr. Silverman's supporting professional, which was

---

accommodations to NBME.  *See* Complaint Ex. 1 at 27-40.  Indeed, in his personal statement in support of his request for extra testing time, he stated:  "As the exam is administered by formal testing facilities that provide visual barriers and noise-suppressing/canceling headphones, I do not believe a private testing environment will be required."  Complaint Ex. 1 at 1.

provided on June 7, 2016. *See id.* ¶ 12. NBME thereafter submitted all of Mr. Silverman's documentation to an independent external reviewer with expertise in the impairments that Mr. Silverman relied upon to support his request. *Id.* ¶¶ 9, 12. Based upon the external reviewer's recommendation and its own independent review of the documentation, NBME concluded that Mr. Silverman had not demonstrated a need for his requested accommodations. NBME denied his request by letter dated August 30, 2016. *See id.* ¶ 14 and Ex. A.

Mr. Silverman had a USMLE scheduling permit at that time that would have allowed him to take a standard administration of the Step 1 test until October 31, 2016; NBME also offered to extend his eligibility period until November 30, 2016. *See id.* ¶ 15. Rather than test under standard conditions, however, Mr. Silverman retained a lawyer. By letter dated September 30, 2016, his attorney asked NBME to reconsider Mr. Silverman's request for additional time on Step 1 of the USMLE. *See id.* ¶ 16.

NBME again solicited input from an external professional, sending all of Mr. Silverman's documentation to a second reviewer. NBME also reviewed his documentation again, as well as the correspondence from his counsel. Based on the external evaluator's recommendation and its own review, NBME again concluded that Mr. Silverman had not shown that he needs extra testing time because of his diagnosed impairments. NBME informed him of this decision by letter dated November 14, 2016. *Id.* ¶ 17 and Ex. B.[4]

---

[4] Mr. Silverman criticizes NBME for denying his request for accommodations "without any personal examination, evaluation, or interview of him." Pl. Br. at 6. However, explained by one of the external experts who reviewed Mr. Silverman's accommodation request, "The practice of reviewing supporting documentation and providing an opinion based upon that documentation is both well-established and professionally sound. It is especially appropriate in the case of diagnoses involving ADHD or LD, because so much of the diagnosis relies on clinical and academic histories, not observations in a clinician's office." Declaration of Benjamin J. Lovett, Ph.D. ("Lovett Decl.") ¶ 5.

### III.    Mr. Silverman's Current Status in Medical School

Mr. Silverman matriculated in the Medical University of South Carolina (MUSC) during the 2011-2012 academic year.  *See* Complaint Ex. 1 at 24 (May 19, 2015 ltr from John R. Freedy, MUSC).    In the late spring of 2012, the school granted his request for testing accommodations of time and one-half on medical school examinations and private testing.  *See id.*  He failed one spring 2012 course and subsequently took a one-year academic leave of absence.  *Id.*  He returned to medical school for the 2013-2014 school year, and, as of May 2015, had successfully completed his first three semesters of medical school.  *Id.*  Although the Associate Dean for Student Affairs predicted in May 2015 that Mr. Silverman was within weeks of completing his second year of medical school, *see id.*, Mr. Silverman reported to NBME in June 2015 that he "had difficulty meeting all 2nd year academic requirements of [his] school" and therefore would postpone taking Step 1 of the USMLE.  *See* Farmer Decl. ¶ 10.

In May 2016, Mr. Silverman was notified by the MUSC Progress Committee that he was being placed on "professionalism probation."   Complaint Ex. 3 at 11 (May 12, 2016 ltr from Sally Self).  The MUSC also noted that Mr. Silverman had already used 4 of the 6 years that MUSC allows students to complete their medical degrees.  *See id.*

In a September 1, 2016 letter to Mr. Silverman, the MUSC Student Progress Committee explained that it had approved an extension for Mr. Silverman to take the USMLE Step 1 until December 31, 2016 "***with or without testing accommodations***."   *See* Silverman Aff. Ex. 3 (emphasis added).   According to the letter, if Mr. Silverman failed to successfully take the examination by this deadline, he "will be required to meet with the Progress Committee."  *Id.*

III.    **Mr. Silverman's Academic and Testing History**

A.    <u>**Academic History**</u>

1.    <u>**Primary and secondary school**</u>

There is no objective evidence (*e.g.*, report cards, teacher comments, test reports) in the record of Mr. Silverman's performance in primary school.  Mr. Silverman reported to one of his evaluators, however, that "he did not have accommodations in grade school and earned A/B's." Foster Report at 1 (Complaint Ex. 1 at 13).[5]

Mr. Silverman attended Dover-Sherborn High School, an academically rigorous public high school in the suburbs of Boston.  *See* Personal Statement at 1 (Complaint Ex. 1 at 2).[6]  He was an A/B student, taking numerous Honors, Advanced Placement, and College Preparatory Classes.  *See* High School Transcript (Complaint Ex. 3 at 10).[7]  He did not receive formal accommodations in any of his classes, although he reports being allowed to complete exams during lunch or after school.  Personal Statement at 1 (Complaint Ex. 1 at 2).

Mr. Silverman also performed very well on standardized tests, which he took without accommodations under standard testing conditions.  Although he states that he was the "very last

---

[5] This contradicts Mr. Silverman's assertion in his preliminary injunction brief that he "received both formal and informal accommodations for his learning disabilities throughout his academic career, dating all the way back to his early years in grade school."  Pl. Br. at 3.  Other than his own assertions, there is nothing in the record indicating he received any formal accommodations prior to his second year of college at Skidmore.  Moreover, there is no mention in the personal statement he submitted to NBME of receiving any "informal" accommodations prior to high school.  *See* Complaint Ex. 1 at 2-3.

[6] According to its website, Dover-Sherborn "was ranked #1 in Boston Magazine, 16th in the nation in Newsweek Magazine, and #9 in US News & World Report."  *See* http://www.doversherborn.org/cf_news/view.cfm?newsid=79.

[7] Mr. Silverman earned a grade lower than a B on only three occasions:  A C+ in Honors "GR Thms" and Algebra II in tenth grade, and a D in Honors "Modern Drama" in twelfth grade.  *See* Complaint Ex. 3 at 10.

student in my 10th grade class to complete the Massachusetts Comprehensive Assessment System," a statewide standardized test, he acknowledges that he "score[d] high enough to receive the John and Abigail Adams Scholarship for free tuition at any Massachusetts state college or university." Personal Statement at 1 (Complaint Ex. 1 at 2).

Mr. Silverman scored 1420 on the SAT without testing accommodations. *Id.* He downplays this as a "respectable" score, *id.*, and asserts that "his scores were significantly lower than expected, given his grade point average in school and his native intellect, due to the fact that significant portions of the exam were left blank ... after he ran out of time[,]" Pl. Br. at 3. But such a score would have put him in approximately the ***97th percentile,*** which means that his score was better than the scores of 97 percent of all college-bound seniors the year he tested.[8]

### 2. College

Mr. Silverman initially attended Tulane University, but his father reportedly pulled him out of school because he was earning C's in his classes. *See* Foster Report at 1 (Complaint Ex. 1 at 13). Mr. Silverman informed one of his evaluators that he had a "fun semester" at Tulane. *See id.* Mr. Silverman worked as a computer programmer during this time period and took flying lessons. *Id.* He also took classes at a community college, including calculus and economics, and earned straight A's. *Id.* He does not report receiving any accommodations in community college or in his work as a computer programmer.

---

[8] Mr. Silverman graduated from high school in 2003 and presumably took the SAT in 2002. NBME has not been able to locate percentile rankings for that year. However, an SAT score of 1420 in 2004 would have placed an examinee in the 97th percentile of all students who took the SAT that year, and percentile rankings do not change dramatically from year to year. *See* http://www.collegeboard.com/prod_downloads/counselors/hs/sat/resources/handbook/4_InterpretingScores.pdf at p. 29.

Mr. Silverman then enrolled at Skidmore College, *see id.*, a private liberal arts college in New York.  After his first year, "he reported that he was not finishing exams on time."  *Id.*  He saw a psychiatrist, began taking Adderall and reportedly began receiving accommodations at school ("i.e., 'extra time on tests, private, quiet testing environment at discretion of program'"). *Id.*; *see also* Oct. 30, 2014 ltr from M. Hegener, Skidmore College (Complaint Ex. 1 at 23).  Mr. Silverman took a semester off of school from Skidmore to attend an engineering program in Colorado.  *See* Foster Report at 1 (Complaint Ex. 1 at 13).  There is no indication in his record that he requested or received accommodations in this program.

In September 2010, Mr. Silverman sat for the Medical College Admission Test ("MCAT") and achieved a total score of 35, which put him at the ***96th percentile***.  *See* MCAT Exam Score Report (Complaint Ex. 1 at 26).  This means he scored better than 96% of all individuals who took this demanding professional school admission test that year.  He scored in the top 4% of all MCAT examinees, and he did so without receiving any extra testing time.

IV.     **Mr. Silverman's Claimed Impairment**

A.      **Danforth Evaluation**

When he was twenty-one years old, Mr. Silverman sought neuropsychological testing from Thomas B. Danforth, Ph.D.  *See* Danforth Report at 1 (Complaint Ex. 1 at 4).[9]  Mr. Silverman reportedly was "referred for evaluations because of problems completing reading assignments, poor retention and recall of what he reads, difficulty completing essay exams and term papers in the allotted time, chronic problems with disorganization, procrastination, forgetfulness, and anxiety and irritability related to academic performance."  *Id.*

---

[9]  Mr. Silverman reportedly was "first diagnosed and treated for ADHD early in high school," Danforth Report at 1, but he did not provide NBME with any records confirming this earlier evaluation.

Dr. Danforth concluded that Mr. Silverman had "very superior and equivalent verbal/linguistic and nonverbal intellectual abilities[,]" noting, among other things, that "his capacities for verbal and, especially, nonverbal problem solving are <u>extremely</u> robust and place him in rarefied territory relative to his peers." *Id.* at 7 (original emphasis). He also noted, however, "discrepant academic skills that make learning and expressing his ideas in a traditional academic setting enormously challenging." *Id.* More specifically, he stated that "results of several measures of academic achievement testing are severely to moderately deficient ***relative to intelligence-based expectations*** (*e.g.*, reading, mathematics and written expression)." *Id.* (emphasis added). In other words, Mr. Silverman had "discrepancies" in his achievement relative to his own very superior intelligence, not to others in the general population. *See also, e.g., id.* at 3 ("While Justin's Reading Composite score was in the high average range (81st percentile), relative to others ***of similar intellect*** his result is unusual (Frequency = <1 percentile)."). Dr. Danforth diagnosed Mr. Silverman with ADHD, Combined Type, Reading Disorder, Mathematics Disorder, and Anxiety Disorder NOS (Not Otherwise Specified). *Id.* at 8.

### B.    Foster Evaluation

Mr. Silverman received an updated psychological assessment from Shantee Foster, Ph.D., in February-March 2012. Dr. Foster's testing again reflected very superior intellectual ability. *See* Foster Report at 2 (Complaint Ex. 1 at 14). The testing showed certain below-average scores on the Nelson-Denny timed reading tests. *Id.* Mr. Silverman also filled out behavior scales and reported symptoms indicative of ADHD, although his mother's report of his behavior on the ADHD behavior scales did not indicate symptoms in the clinical range. *See id.* at 3.

Dr. Foster diagnosed Mr. Silverman with ADHD, Combined type and a Reading Disorder. *See id.* at 4. Dr. Foster assigned him a GAF (Global Assessment of Functioning)

Scale score of 75, which correlates to the following level of impairment: "If symptoms are present, they are transient and expectable reactions to psycho-social stressors (*e.g.*, difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *See* Declaration of Steven G. Zecker, Ph.D. ("Zecker Decl."), Ex. B at 6.

## ARGUMENT

### I.     PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an "extraordinary" remedy that should not be granted unless a plaintiff shows that the four prerequisite factors all support the requested relief. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *see also, e.g., In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003) ("'Preliminary injunctions are extraordinary remedies involving the exercise of far-reaching power to be granted only sparingly and in limited circumstances.'") (citation omitted). A plaintiff must make a "clear showing" that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20, 22; *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). If a plaintiff fails to satisfy any one of the *Winter* factors, the preliminary injunction must be denied. *See* 555 U.S. at 22.

The burden on Mr. Silverman is even higher here, because he seeks a mandatory preliminary injunction that would alter the status quo and award him all of the substantive relief he seeks in this lawsuit. *See Microsoft Corp. Antitrust Litig.*, 333 F.3d at 526 ("Mandatory preliminary injunctions [generally] do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.")

(quoting *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)).  "'[A]pplication of th[e] exacting standard of review [for preliminary injunctions] is even more searching' the relief requested 'is mandatory rather than prohibitory in nature.'"  *De La Fuente v. South Carolina Dem. Party*, 164 F. Supp. 3d 794, 798 (D.S.C. 2016) (citation omitted).  Mr. Silverman has not satisfied the demanding standard for issuance of a mandatory preliminary injunction.

## II.    MR. SILVERMAN HAS NOT MADE A CLEAR SHOWING THAT HE IS LIKELY TO SUFFER IRREPARABLE HARM

It is difficult to know which preliminary injunction factor to address first, insofar as Mr. Silverman has not come close to meeting any of the four factors.  However, his facially untenable claim of threatened irreparable harm is a reasonable place to start.

According to Mr. Silverman, he "is nearly certain to be dismissed from [MUSC] if he is not granted the preliminary relief that would allow him to complete the USMLE Step 1 by December 31, 2016."  Pl. Br. at 15; *see id.* at 16 ("Plaintiff faces the *near certainty* that he will be dismissed from MUSC and will never be permitted thereafter to obtain his medical degree from any other institution.").  This argument is entirely speculative and cannot support preliminary injunctive relief.  *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (threatened harm must be "'neither remote nor speculative, but actual and imminent.'") (citations omitted); *cf. Mahmood v. NBME*, No. 12-1544, 2012 U.S. Dist. LEXIS 86837, at *14-15 (E.D. Pa. June 21, 2012) ("Although [plaintiff] claims a three-year suspension effectively precludes her ability to graduate from medical school within seven years, she does not fully explore or explain alternatives.  For example, she does not discuss whether her school might grant her an extension of the seven-year requirement and provides no evidence of an inability to transfer schools.").  There is nothing in the record that establishes that Mr. Silverman

would, in fact, be dismissed from medical school. Instead, he has been informed that if he does not "successfully complete Step 1 by the established deadline," he "will be required to meet with the Program Committee." Silverman Aff. Ex. 3. This does not show that Mr. Silverman would be dismissed from medical school and does not establish a risk of irreparable harm.

The argument also fails for a second reason. All that the MUSC Progress Committee required is that Mr. Silverman take the Step 1 exam by a stated date – "with or without testing accommodations." Silverman Aff. Ex. 3. He could have solved his own purported dilemma simply by taking a standard administration of the test. He was registered to test earlier this year, and NBME offered to extend his eligibility period until November 30, 2016, after his accommodation request was denied. *See* Farmer Decl. ¶ 15. However, he chose not to test.

Likewise, to the extent there is any time pressure on Mr. Silverman due to MUSC's policy that medical school be completed in six years, this also is a problem of his own making. Mr. Silverman took a one-year leave of absence from medical school after failing a course in Spring 2012. *See* May 19, 2015 ltr from John Freedy (Complaint Ex. 1 at 4). After returning from his leave of absence, he was presumptively eligible to sit for the Step 1 exam in or around June 2015, *see id.*, but he cancelled his test registration because he was having "difficulty meeting all 2nd year academic requirements of [his] school." *See* Farmer Decl. ¶ 10. He did not seek to test again until 2016. The urgency that purportedly warrants emergency relief therefore cannot reasonably be attributed to NBME, it is attributable to Mr. Silverman's own actions. This does not constitute irreparable harm. *See Colón-Marrero v. Conty-Pérez*, 703 F.3d 134, 139 (1st Cir. 2012) (finding that plaintiff's claims of irreparable harm based on removal from voter roll was undermined by the fact that her emergency was largely one of her own making, where she had "ample opportunity to reactivate her voting status").

Nevertheless, relying on *Rush v. NBME*, Mr. Silverman argues that he will be irreparably harmed because he will either not take the test by the date purportedly required by his medical school (a decision entirely within his own control), thereby risking the possibility that he might be dismissed from school; or, if he tests without accommodations, his score might not be high as high as he would like, thereby creating a risk that "the opportunity to enter into a desirable residency program will be closed to him forever."  Pl. Br. at 17 (citing *Rush*, 268 F. Supp. 2d 673, 676 (N.D. Tex. 2003)).[10]  The latter risk is again entirely speculative, as there is no way of knowing how Mr. Silverman would perform without accommodations.  He took the SAT and MCAT examinations without accommodations and performed exceptionally well, scoring within the top 5 percent of all examinees across the United States on both examinations who tested when he tested.  *See supra* at 7, 8.  There is no basis for concluding that anything different would happen if he takes the Step 1 exam without accommodations.  *See Bach v. Law School Admission Council*, No. 1:13-cv-888, 2014 U.S. Dist. LEXIS 124632, at *5-6 (M.D.N.C. 2014) (noting that plaintiff's argument regarding his likely test results if he tested without accommodations was speculative, as he had had successfully taken other standardized tests without accommodations) (denying preliminary injunction); *Kelly v. W. Va. Bd. of Law Exam'rs*, No. 2:08-933, 2008 U.S. Dist. LEXIS 56840, at *6 (S.D.W. Va. 2008) (no irreparable harm where plaintiff successfully completed other examinations without accommodations); *Baer v. Nat'l Bd. of Med. Examiners*,

---

[10]  Mr. Silverman's reliance on *Rush* is misplaced.  As an initial matter, the analysis in *Rush* is very brief and the court appeared to presume irreparable harm once it concluded that the plaintiff was disabled within the meaning of the ADA.  268 F. Supp. 2d at 678.  As discussed below, Mr. Silverman is not likely to succeed in showing that he is disabled within the meaning of the ADA.  The plaintiff in *Rush*, moreover, had an extensive history of accommodations in test taking dating back to middle school and achieved low scores on the MCAT in two standard administrations of that exam.  *Id.* at 674-75.  Mr. Silverman, in contrast, did not receive formal accommodations in school until his second year of college and performed exceptionally well on the MCAT and other timed standardized tests without accommodations.

392 F. Supp. 2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.") (denying preliminary injunction). There is also absolutely nothing in the record to establish how his Step 1 score – regardless of how high or low it may be – would impact his placement in a residency program.

Mr. Silverman also argues that he will suffer irreparable harm because he would not be entitled to monetary damages if he were to ultimately prevail. *See* Pl. Br. at 16. Mr. Silverman is correct that he cannot recover damages under Title III of the ADA, but this does not constitute irreparable harm. *See Rothberg v. LSAC*, 102 Fed. App'x 122, 125 (10th Cir. 2004) ("The mere unavailability of compensatory damages . . . does not compel the conclusion that any harm suffered by [plaintiff] is irreparable because the harm alleged by [plaintiff] is speculative."). Indeed, Mr. Silverman is basically arguing that irreparable harm should be presumed because he has alleged a violation of the ADA. However, "no case law has been found to support the idea that merely ***alleging*** violations of the ADA and Rehab Act, without more, establishes irreparable injury." *Lincoln CERCPAC v. Health & Hospitals Corp.*, 920 F. Supp. 488, 495-96 (S.D.N.Y. 1996) (emphasis added). This is especially true here, where, as discussed below, Mr. Silverman has not shown a likelihood of success on his claim of discrimination.

### III.    MR. SILVERMAN IS NOT LIKELY TO SUCCEED ON THE MERITS

Mr. Silverman's motion also must be denied because he has not made a clear showing that he is likely to succeed on the merits.  Mr. Silverman has not shown that his ability to read or learn is substantially limited compared to most people in the general population.

### A.    Disability Under The ADA, As Amended:  Substantial Limitation In A Major Life Activity Compared To Most People In The General Population.

NBME is subject to a specific provision of Title III the ADA, 42 U.S.C. § 12189, which provides in relevant part as follows:

> Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.   Thus, the ADA requires NBME to offer the USMLE in a place and manner that is accessible to individuals with disabilities.[11]

An individual is disabled within the meaning of the ADA if he or she has "a physical or mental impairment that substantially limits one or more major life activities . . . ."  42 U.S.C. § 12102(1)(A).  In the ADA Amendments Act of 2008 ("ADAAA"), Congress emphasized that the statute should be construed to provide "broad coverage."  42 U.S.C. § 12102(4)(A); *see also Summers v. Altarum Instit.*, 740 F.3d 325, 329 (4th Cir. 2014).   Nevertheless, an individual seeking disability-based accommodations or pursuing a claim of disability discrimination must still prove that he is, in fact, disabled within the meaning of the statute.  *See* 42 U.S.C. § 12102(4)(A); *see also, e.g., Neely v. PSEG Texas, LP*, 735 F.3d 242, 245 (5th Cir. 2013) ("Although the text of the ADAAA expresses Congress's intention to broaden the definition and

---

[11] Plaintiff incorrectly relies on 42 U.S.C. § 12112(b)(5)(A) as applicable to NBME.  *See* Pl. Br. at 8.  This provision from Title I of the ADA only applies in the context of employment.

coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination."); *cf. Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 n.10 (4th Cir. 2012) (noting plaintiff had not proven himself to be disabled under either the original version of the ADA or under the ADAAA); *Scavetta v. Dillon Cos.,* No. 13-1311, 2014 U.S. App. LEXIS 12133, at *8-9 (10th Cir. June 27, 2014) (reiterating that there is no "per se" disability under the ADAAA) (citation omitted).

Even under the ADAAA, not every diagnosed impairment constitutes a covered disability, as confirmed by the statute's legislative history:

> By retaining the essential elements of the definition of disability including the key term 'substantially limits' we reaffirm that not every individual with a physical or mental impairment is covered by the . . . definition of disability in the ADA. An impairment that does not substantially limit a major life activity is not a disability under [the first prong of the definition]. That will not change after enactment of the ADA Amendments Act, nor will the necessity of making this determination on an individual basis. . . .

> We believe that the manner in which we understood the intended scope of "substantially limits" in 1990 continues to capture our sense of the appropriate level of coverage under this law for purposes of placing on employers and other covered entities the obligation of providing reasonable accommodations and modifications to individuals with impairments. As we described this in our committee report to the original ADA in 1989:

> A person is considered an individual with a disability for purposes of the first prong of the definition when [one or more of] the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people. A person who can walk for 10 miles continuously is not substantially limited in walking merely because on the eleventh mile, he or she begins to experience pain because most people would not be able to walk eleven miles without experiencing some discomfort. S. Rep. No 101-116, at 23 (1989) . . . .

> Thus, we believe that the term "substantially limits" as construed consistently with the findings and purposes of this legislation establishes an appropriate functionality test for determining whether an individual has a disability.

Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act Amendments Act of 2008, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008). This is reiterated in the regulations implementing Title III of the ADA, which provide: "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population*. An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity to be considered substantially limiting. Nonetheless, *not every impairment will constitute a disability* . . . ." 28 C.F.R. § 36.105(d)(1)(v) (emphases added).[12]

Thus, although it is no longer necessary for an individual to show that he is "prevented" or "severely restricted" in his ability to perform a major life activity to establish a disability under the ADA, he still must show that, as a result of an impairment, he is *substantially limited in his ability to perform a major life activity as compared to most people in the general population*. *See, e.g., Neely v. Benchmark Family Services*, 640 Fed. App'x 429, 434-35 (6th Cir. 2016) ("Though the 2008 Amendments undoubtedly eased the burden required for plaintiffs to establish disability, we note that Congress expressly chose to retain the 'substantially limits' modifier for 'one or more major life activities.' . . . A lesser burden is a burden nonetheless...."); *Weaving v. City of Hillsborough*, 763 F.3d 1106, 2014 U.S. App. LEXIS 15762, at *16-21 (9th

---

[12] Plaintiff argues that "a person is considered to be disabled when the individual's important life activities are restricted as to 'the conditions, manner, or duration' under which they can be performed in comparison to most people." Pl. Br. at 10 (citing 28 C.F.R. § 36.105(d)(ix)(3)(i)). Plaintiff apparently is referencing 28 C.F.R. § 36.105(d)(3)(i), which provides that in determining whether an individual is substantially limited in a major life activity, although not required "it *may be useful in appropriate cases* to consider, *as compared to most people in the general population*, the conditions under which the individual performs the major life activity; the manner in which the individual performs the major life activity; or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity." (Emphases added.)

Cir. 2014) (reversing district court denial of judgment as a matter of law following jury verdict in favor of plaintiff with ADHD because he was not substantially limited compared to most people in the general population in the activities of working or interacting with others); *Crowell v. Denver Health & Hosp. Auth.*, No. 13-1355, 2014 U.S. App. LEXIS 13965, at \*21 (10th Cir. 2014) (affirming judgment as a matter of law in favor of defendant where testimony of plaintiff's treatment provider showed she was not substantially limited in her ability to lift, sit, and walk compared to most people); *Mann v. Louisiana High Sch. Athletic Assoc.*, 535 Fed. Appx. 405, 410 (5th Cir. 2013) ("Although the ADA Amendments Act of 2008 lowered the standard that plaintiffs must meet to show that they are disabled, . . . a plaintiff must still show substantial limitation....") (reversing grant of preliminary injunction because diagnosis of anxiety disorder, standing alone, was insufficient to show disability under the ADAAA). Mr. Silverman's alleged impairment must be measured against most people in the general population, not other college graduates or medical students, and not compared to his own actual or perceived intellectual potential. *See Singh v. George Washington Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007) (explaining that the relevant comparison is to the average person in the general population, not to other individuals attending medical school).

### B. Assessing Disability When Someone Claims to Have ADHD or a Reading Disorder

Mr. Silverman claims that he is disabled within the meaning of the ADA based upon his having received a diagnosis that he suffers from Attention Deficit-Hyperactivity Disorder ("ADHD") and a reading disorder.

ADHD is a neurodevelopmental disorder. The diagnostic guidelines for ADHD are set forth in the Diagnostic and Statistical Manual of Mental Disorders, the most recent edition of which is the Fifth Edition (DSM-5). ADHD is not a learning disability.

To be properly diagnosed with ADHD, the diagnostic criteria requires that someone have unusually high levels of symptoms of inattention and/or hyperactivity/impulsiveness that begin in childhood (by age 12), occur across settings, and interfere with functioning in real-world settings. *See* Lovett Decl. ¶ 8. Typically, young adults with valid ADHD diagnoses can point to evidence of their disorder that includes ratings of their symptoms by other parties who know them well (*e.g.*, parents, friends, significant others), documented problems in school (*e.g.*, low grades, problem behavior, or difficulty completing tasks and complying with teacher requests), and significant difficulties with current everyday life responsibilities. *See id.*

To be properly diagnosed with a learning disability such as a reading disorder, the diagnostic criteria require that someone have academic skills that are clearly below the average range and that cause problems performing in real-world settings. *Id.* ¶ 9. These academic skill weaknesses would be present in the person's childhood and would not be better accounted for by other factors (for example, general low intelligence). *Id.* Mr. Silverman argues, without support, that "[t]he fact that Silverman's learning disabilities were not recognized early in life is not uncommon." Pl. Br. at 12. However, young adults with valid LD diagnoses typically can point to evidence of their disorder in documentation such as report cards from primary and secondary school reflecting low grades in their area of LD, special education records showing the specialized instruction and related services they were provided, and reports from professional evaluations showing below-average scores on diagnostic achievement tests in the area of their LD. *See* Lovett Decl. *id.* ¶ 9.

**C.    Mr. Silverman is Not Likely to Succeed in Showing That He is Disabled Within the Meaning of the ADA.**

As discussed above, to show that he is disabled within the meaning of the ADA, Mr. Silverman must prove that he has a "physical or mental impairment that substantially limits one or more major life activities."    42 U.S.C. § 12102(1)(A).    The records that Mr. Silverman submitted to NBME and that he relies upon in support of his motion for mandatory preliminary relief do not show that he is likely to succeed on the merits of this argument.    Indeed, his records affirmatively demonstrate that Mr. Silverman is *not* disabled within the meaning of the ADA. As one of NBME's external evaluators describes it:  "I have reviewed over 600 applications for accommodations on different types of tests.  Mr. Silverman's application is not a borderline case. His documentation instead contains credible and powerful evidence *against* any need for accommodations to access tests as well as most people in the general population can."  Lovett Decl. ¶ 18 (original emphasis).

First, there is a significant question whether Mr. Silverman suffers from a physical or mental impairment.  Although Mr. Silverman has been diagnosed with ADHD, the diagnosis does not appear to be consistent with applicable diagnostic criteria.[13]  There is no objective evidence that Mr. Silverman was impaired due to ADHD-type symptoms during childhood or adolescence, and there is little to no information about Mr. Silverman's apparent ADHD diagnosis in high school.  *See* Lovett Decl. Ex. B at 2.  Mr. Silverman's own report of clinical

---

[13]  *See generally* J. Joy,  "Assessment of ADHD Documentation from Candidates Requesting [ADA] Accommodations for the National Board of Osteopathic Medical Examiners COMLEX Exam," 14(2) J. of Attention Deficit Disorders 104, 106 (2010) (discussing results of an independent professional review of requests for testing accommodations from 50 individuals who claimed to have ADHD:  of the 50 files reviewed, "only 14% (7 out of 50) of applicants provided sufficient clinical information to meet the criteria for ADHD").

levels of ADHD symptoms on standardized rating skills vary from those of his mother, who

reported non-clinical levels of ADHD symptoms by 2012.  *See id.*; *see also* Zecker Decl. Ex. B

at 4, 5.  His performance on diagnostic tests measuring attention and executive functioning was

mixed.  *See* Lovett Decl. Ex. B at 2; Zecker Decl. Ex. B at 4, 5.

There is also insufficient documentation to support a reading disorder diagnosis.  As Dr.

Lovett notes:

> Beyond the data in the 2012 evaluation, if Mr. Silverman had a learning disability
> in reading, we would expect to see evidence of below-average reading skills from
> earlier in his life.  Learning disabilities are neurodevelopmental disorders that
> start in childhood, but it is not even clear that Mr. Silverman *claims* to have had
> poor reading skills as a child, except in comparison to his sister, who he describes
> as a 'prolific reader.'  Certainly, there is no objective evidence of poor reading
> skills (such as low grades in language arts) in childhood.  The lack of any real-
> world objective evidence of reading problems leads me to conclude that there is
> insufficient evidence of a learning disability in reading.

Lovett Decl. Ex. B at 2 (original emphasis); *see also id.* at ¶ 7; Zecker Decl. Ex. B at 7.  Mr.

Silverman now argues that he received "informal accommodations in his small, private schools,

throughout grade and high school[,]" Pl. Br. at 12, but there is no *objective* evidence of any such

accommodations in the record or any functional limitations experienced by Mr. Silverman during

this time – not a single report card, or teacher report, or any other indicia that Mr. Silverman

experienced significant challenges in reading during his formative years.  Mr. Silverman also

apparently informed his evaluators that he did not receive any accommodations in grade school,

where he earned A's and B's.  *See* Foster Report at 1 (Complaint Ex. 1 at 13).

Second, even if one accepts Mr. Silverman's diagnoses at face value, merely having a

diagnosed impairment is not enough to show that he is disabled within the meaning of the ADA.

*See, e.g.*, *Rudolph v. Buncombe Cty. Gov't*, 846 F. Supp. 2d 461, 471 (W.D.N.C. 2012) ("Having

ADHD . . . does not necessarily dictate that the Plaintiff was disabled."), *aff'd*, 474 Fed. Appx.

931 (4th Cir. 2012); *cf. Costello v. UNC*, No. 03-1050, 2006 U.S. Dist. LEXIS 90519, at *12 (M.D.N.C. 2006) ("[A] mere medical diagnosis of an impairment is insufficient to prove disability status.") (summary judgment to defendant on Rehabilitation Act claim); *Rawdin v. Amer. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 649 (E.D. Pa. 2013) ("[T]he changes reflected in the ADAAA were not intended to make 'every impairment . . . a disability within the meaning of this section.'")(citations omitted), *aff'd on other grounds*, 582 Fed. Appx. 114 (3d Cir. 2014). Instead, "[t]he relevant inquiry remains whether the impairment 'substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" *Id.* (citation omitted).

Mr. Silverman claims to be substantially limited in the major life activities of reading and learning. *See* Pl. Br. at 11. The record evidence, however, does not establish that Mr. Silverman has any impairment that substantially limits him in reading or learning, particularly when compared to most people in the general population. Mr. Silverman earned almost all A's and B's in high school while taking many advanced classes and with no formal accommodations. *See* High School Transcript (Complaint Ex. 3 at 10). He reportedly earned C's during his first year at Tulane University, where he had a "fun semester." Foster Report at 1 (Complaint Ex. 1 at 13). After that, he earned straight A's in community college classes, again with no indication that formal accommodations were requested or provided. *See id.*

Even more telling, Mr. Silverman has performed exceedingly well on timed, standardized tests, scoring a 1420 on the SAT (the 97th percentile) and a 35 on the MCAT (the 96th percentile). *See* Complaint Ex. 1 at 2 (Personal Statement); MCAT Score Report (Complaint Ex. 1 at 7). Individuals who perform at that level without any accommodations do not have a reading or attention disorder that rises to the level of a disability under the ADA. *See, e.g.,*

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, No. 15-4987, 2016 U.S. Dist. LEXIS 48181, at *25 (E.D. Pa. 2016) (individual who scored in the 71st percentile on the GRE (a graduate school admission test) and in the "average" range on the reading section of the MCAT without accommodations was not substantially limited compared to most people in reading); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, . . . stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population.").

Mr. Silverman points to testing performed by Dr. Foster in 2012 as evidence that he has a developmental reading disorder and ADHD, which allegedly substantially limit him in the major life activities of learning and reading. *See* Pl. Br. at 11. Mr. Silverman focuses on his performance on the Nelson Denny Reading Test (NDRT), where he obtained a total score placing him in the 2nd percentile range and a reading comprehension score that placed him in the 1st percentile, at a 6.3 grade equivalent. *See id.* As explained by NBME's external evaluator, however, these scores are anomalous, given Mr. Silverman's very high score on the MCAT verbal reasoning test, which measures similar skills. *See* Lovett Decl. ¶ 13. Mr. Silverman's evaluator made no attempt to address or explain this discrepancy. *See id.* Contrary to Mr. Silverman's argument, these isolated test scores, obtained in an evaluation that was targeted to obtaining accommodations, do not "conclusively establish" that Mr. Silverman is substantially limited in reading or learning, particularly given the weight of all the contrary evidence in the record. *See* Zecker Decl. Ex. B at 5; Lovett Decl. ¶¶ 13-17 and Ex. B at 1-2. The fact that Mr. Silverman's scores on the Nelson Denny improved with extra time, *see* Pl. Br. at 11, also is not significant. *See* Lovett Decl. ¶ 14.

2:16-cv-03686-DCN     Date Filed 12/08/16     Entry Number 14     Page 24 of 29

Mr. Silverman also points to Dr. Danforth's 2005/6 evaluation to show that his "reading and comprehension speed is 'substantially limited' in comparison with the general population." Pl. Br. at 11. All of Mr. Silverman's reading scores from that evaluation, however, are in the average range or higher. *See* Lovett Decl. ¶ 15. As Dr. Lovett explains:

> It appears that Dr. Danforth made the reading disability diagnosis because Mr. Silverman obtained certain reading scores that were below his (even higher) IQ; this diagnostic approach (often called 'discrepancy analysis') is known to be an unreliable and invalid way to diagnose reading disabilities, but even if a diagnostician insists on using it, it clearly cannot indicate whether someone is substantially impaired in reading compared to most people.

*Id.*; *see also* Zecker Decl. Ex. B at 3-4.

Citing 28 C.F.R. § 36.309(b)(v), Mr. Silverman argues that NBME improperly "ignored" evidence of his classroom accommodations at MUSC. *See* Pl. Br. at 13. That is not the case. NBME carefully considers all the evidence it is provided in determining whether to approve a request for testing accommodations, and did so here. *See* Farmer Decl. ¶ 7 and Ex. B. NBME is not required, however, to approve any particular accommodation simply because it was previously provided. Receiving accommodations in an academic context is very different from receiving accommodations on a standardized test, and it was entirely appropriate for NBME to conduct its own assessment of Mr. Silverman's documentation and determine whether he is entitled to accommodations on the USMLE. *Cf. Ware v. Wyoming Bd. of Law Exam'rs*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997) ("Although information regarding past accommodations may be helpful..., the fact that a person has been granted a particular accommodation in the past does not mean that such accommodations are presumptively reasonable. Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."), *aff'd mem.*, 161 F.3d 19 (10th Cir. 1998). Indeed, the more relevant accommodation history for Mr.

27740597.1                                      - 24 -

Silverman is the fact that he has ***never*** been accommodated on a national standardized test yet has performed extremely well on such tests.  Moreover, the implementing regulation referenced by Mr. Silverman requires that "considerable weight" be given to documentation of past accommodations "received in similar testing situations[.]"   28 C.F.R. § 36.309(b)(v).   Mr. Silverman has never been accommodated on a timed standardized test like the USMLE Step 1. To the contrary, he took the SAT and MCAT under standard time conditions.

Mr. Silverman argues that NBME has improperly focused on his prior success in school and on standardized tests without formal accommodations, and not on the alleged fact that "[t]he process of reading for the Plaintiff is 'cumbersome, painful, deliberate and slow'."  Pl. Br. at 13-14.  Putting aside the complete lack of credible objective evidence in the record that his reading is, in fact, "cumbersome, painful, deliberate and slow," it is entirely appropriate to look at Mr. Silverman's real-world functioning to determine whether he is disabled within the meaning of the ADA.  Before and after the amendments to the ADA, courts have looked to objective evidence of individuals' actual performance on other standardized tests and/or in academic or other environments in determining whether they are substantially limited in major life activities such as learning or reading (or any other activities implicated with respect to taking standardized tests).  *See, e.g., Bibber*, 2016 U.S. Dist. LEXIS 48181, at *19-20 (explaining courts have considered numerous factors, including "objective test results," "any pattern of substantial academic difficulties," and "whether the individual has been afforded testing accommodations in the past"); *Healy*, 870 F. Supp. 2d at 620-21 ("[C]ourts have considered the plaintiff's objective test results as compared to the average person, . . . the plaintiff's other activities, including extracurriculars, . . . whether there exists a pattern of substantial academic difficulties, ... and whether the plaintiff has been afforded testing accommodations in the past ....") (citations

omitted); *see also, e.g., Palotai v. Univ. of Maryland*, 38 Fed. Appx. 946, 955 (4th Cir. 2002) (noting that report of plaintiff's psychologist addressing his learning disabilities did not compare his ability to learn with that of an average person in the general population and finding "[t]his deficiency is particularly crucial in  a case like this one in which the person claiming a significant limitation on his ability to learn has a demonstrated record of academic achievement...."); *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 155 (1st Cir. 1998) ("The record shows that Jason never experienced significant academic difficulties, and  in fact has excelled academically for most of his years at the Baldwin School."); *Bach*, 2014 U.S. Dist. LEXIS 124632, at *5 ("Mr. Bach's long history of academic success weighs against a finding of disability."); *Rumbin v. Ass'n of American Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Ct. 2011) ("Mr. Rumbin's condition affects aspects of the way in which he leads his life.  However, the evidence of his past employment requiring substantial visual focus, his ability to paint and read books, and his prior education and test-taking without accommodations, demonstrate that he is not substantially limited in the major life activities of seeing, learning, and reading."); *Love v. Law School Admission Council*, 513 F. Supp. 2d 206, 228 (E.D. Pa. 2007) ("Given all the evidence presented, including Plaintiff's test scores, clinical evaluations, educational history, and his reported ability to function in both academic and professional environments, we are not persuaded that Plaintiff has a disability as defined under the ADA.").[14]

---

[14] Citing *Bartlett v. NY State Bd. of Law Exam'rs*, 226 F.3d 69, 81 (2d Cir. 2000), Mr. Silverman argues that his prior success on the SAT "cannot preclude a finding of disability where Plaintiff's ability to process the written word is undisputably and significantly impaired compared to most people."  Pl. Br. at 14.  Putting aside the fact that "Plaintiff's ability to process the written word" is very much in dispute, the referenced opinion cited does not support his proposition.  There, the court made no conclusions regarding whether plaintiff was disabled, remanding the issue for a determination of whether plaintiff was substantially limited in comparison to most people.  In the discussion cited by Mr. Silverman, the Second Circuit discounted the results of Bartlett's

The objective evidence here shows that Mr. Silverman is not substantially limited in any major life activity.  He has fallen far short of showing a likelihood of success on the merits of his ADA claim.

## IV.    ANY CLAIMED HARM TO MR. SILVERMAN DOES NOT OUTWEIGH THE HARM TO NBME IF AN INJUNCTION ISSUES

Mr. Silverman claims that the potential harm to him in the absence of injunctive relief "would be enormous," but that NBME "will suffer very little, if any hardship if the injunction is granted."  Pl. Br. at 18.  He is not correct, on either end of his analysis.

As discussed above, Mr. Silverman's claim of irreparable harm is speculative, at best. The alleged irreparable harm that he points to may well be non-existent and could be prevented altogether if he just took the Step 1 exam under standard conditions.

His assertion with respect to the potential harm to NBME is also misguided.  He argues that NBME already provides testing accommodations to individuals with learning disabilities, so it will suffer no harm if it grants him extra testing time.  *See id.*  It is true that NBME provides extra testing time to individuals who demonstrate that they are disabled under the ADA and need extra time.  *See* Farmer Decl. ¶¶ 7, 8.  But NBME denies accommodations when the applicant has not established the existence of an impairment that rises to the level of a disability as defined by the ADA.  *See id.*   NBME does so to ensure that its testing program is fair to all examinees, and to protect the comparability and validity of USMLE scores.  *Id.; see also Powell v. NBME,* 364 F.3d at 88-89.  Because of those concerns, the potential harm to NBME outweighs any claimed harm to Mr. Silverman from not being able to test with accommodations this December.

---

performance on the Nelson Denny Reading Test, "which show a reading rate in the fourth percentile or below as compared to college freshman," saying that they "are of limited value, because the proper reference group is 'most people,' not college freshman."  226 F.3d at 81-82.

*See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) ("The entire preliminary injunction inquiry, and particularly the requirement that the district court carefully balance the harms to the parties, is intended to ensure that the district court 'chooses the course of action that will minimize the costs of being mistaken.'") (citation omitted).

## VI.    AN INJUNCTION DOES NOT SERVE THE PUBLIC INTEREST

Mr. Silverman argues that the public interest would be served by granting him a preliminary injunction because it will further the purpose of the ADA. *See* Pl. Br. at 18-19. This argument assumes—incorrectly—that Mr. Silverman has demonstrated that he is, in fact, disabled within the meaning of the ADA and entitled to his requested accommodations.

According to Mr. Silverman, NBME "clearly failed to uphold its obligations" under its 2011 Settlement Agreement with the United States Department of Justice ("DOJ") when it processed Mr. Silverman's request for accommodations. *See* Pl. Br. at 19. That is not the case, however. NBME carefully considered whether Mr. Silverman's ability to read is substantially limited within the meaning of the ADA. NBME also considered the reasons offered by Mr. Silverman regarding his late diagnoses, along with the academic records and objective evidence he submitted relating to his reading ability. Finally, NBME sought input from external experts regarding Mr. Silverman's accommodation request. Based upon all this information, NBME concluded that Mr. Silverman is *not* substantially limited compared to most people in his ability to read. *See* Farmer Decl. ¶¶ 14, 17. NBME's Settlement Agreement with the DOJ recognizes that NBME has the right to independently examine a candidate's supporting documentation and to seek input from external professionals. It also recognizes that NBME is not required to the conclusions reached or recommendations made by a candidate's supporting professionals.

NBME's actions and decisions with respect to Mr. Silverman's request were thus entirely consistent with its rights and obligations under the DOJ Settlement Agreement.

Finally, broader interests must also be considered when evaluating the public interest in this context. "Although the public certainly has an interest in the enforcement of the ADA, ... the public also has an interest in the fair administration of standardized tests." *Bach*, 2014 U.S. Dist. LEXIS 124632, at *7-8 (finding that the public interest did not weigh in favor of either party). Other candidates do not want extra testing time to be granted to individuals who are not disabled, as that could provide an advantage that is denied to other test takers. Nor do score users want unwarranted accommodations to be provided, because such accommodations can affect the comparability of the resulting test scores. Factoring these other interests into the mix, the public interest clearly supports not awarding accommodations by way of a preliminary injunction when the record shows that such accommodations are neither needed nor warranted.

**CONCLUSION**

Mr. Silverman's motion for preliminary injunction should be denied.

Dated:  December 8, 2016                              Respectfully submitted,


                                                     /s/ SUE ERWIN HARPER
                                                     Sue Erwin Harper
                                                     Fed. ID No. 737
                                                     **Nelson Mullins Riley & Scarborough LLP**
                                                     Liberty Center, Suite 600
                                                     151 Meeting Street
                                                     Charleston, SC 29401
                                                     Tel: 843.534.5200
                                                     Fax: 843.534.8700
                                                     corky.harper@nelsonmullins.com

                                                     Counsel for Defendant NBME