# TAB B

**Steven G. Zecker, Ph.D.**
**Clinical Psychologist**

Evanston, IL

October 10, 2016

Cathy Farmer, Psy.D.
National Board of Medical Examiners
Disability Services
3750 Market Street
Philadelphia, PA 19104

Dear Dr. Farmer:

      I am writing to you concerning the materials that were submitted to your office by Justin R. Silverman of Charleston, South Carolina (USMLE ID# 5-304-197-6), who is currently a student at the Medical University of South Carolina (MUSC). Mr. Silverman has requested special testing accommodations on Step 1 of the United States Medical Licensing Examination (USMLE). He states that he has been diagnosed with Attention-Deficit Hyperactivity Disorder-Combined Type (ADHD-C) and Developmental Reading Disorder (RD), and that because of these disabilities he requires an extended-time (time and one-half) accommodation and testing over two days in order to be able to successfully complete the Step 1 examination. I understand that Mr. Silverman's 2015 request for Step 1 accommodations was denied, and his request for accommodations is now being reconsidered.

      In support of his request for testing accommodations, Mr. Silverman provided the following documentation for review: 1) two *'Request for Test Accommodations'* forms, dated April 28, 2015 and March 7, 2016; 2) a May 18, 2015 personal statement in which he describes how his conditions have impaired his learning and academic functioning; 3) a January 2006 report of a *'Neuropsychological Evaluation'* completed by T. B. Danforth, Ph.D., a licensed psychologist and clinical neuropsychologist in North Easton, Massachusetts; 4) a *'Testing Report'* of an evaluation conducted in February and March 2012 by S. Foster, Ph.D., Postdoctoral Fellow, and A. Q. Libet, Ph.D., a licensed clinical psychologist in Counseling and Psychological Services at MUSC; 5) a computer-generated *'Summary and Score Report'* from Dr. Libet's March 21, 2012 testing with the Woodcock-Johnson-III Tests of Achievement (WJ-III); 6) a May 19, 2015 letter to the NBME from J. R. Freedy, M.D., Ph.D., Associate Dean for Student Affairs at MUSC, in which he writes that Mr. Silverman began receiving accommodations at MUSC at the end of his first year of coursework, and that he continued to receive them after returning from a one-year leave of absence from MUSC; 7) an October 30, 2014 *'To Whom It May Concern'* letter from M. Hegener, Coordinator of Student Academic Services at Skidmore College, in which she indicates that Mr. Silverman received accommodations while an undergraduate at the school; 8) a *'Certificate of Prior Test Accommodations'* form completed on May 19, 2015 by Dr. Freedy, in which he indicates that Mr. Silverman has received accommodations at the school since March 2012; 9) a May 12, 2016 letter to Mr. Silverman from S. Self, M.D., Associate Dean for Student Progress at MUSC, in

which she indicates that the school's Professional Standards Subcommittee had placed him on "professionalism probation" because of issues with tardiness and failing to complete assignments on time; 10) a June 2, 2016 email to Mr. Silverman from M. M. Goldberg, Ph.D., Manager, Disability Services at the NBME, in which she indicates that WJ-III scores based on age-norms were not provided in his 2012 evaluation and requests that they be provided to complete his accommodations request; 11) a copy of Mr. Silverman's high school transcript from Dover-Sherborn Regional High School in Dover, Massachusetts (1999-2002); 12) a copy of Mr. Silverman's *'MCAT Exam Score Report'* from one administration of the Medical College Admission Test (MCAT) September 2010; 13) an August 30, 2016 letter from you to Mr. Silverman in which you indicate that his previous request for Step 1 accommodations was not approved; and 14) a September 30, 2016 letter to you and S. Z. Green, Esq., General Counsel at the NBME, from A. Holmes, an attorney with Gibbs and Holmes in Charleston, South Carolina, in which he indicates that he is representing Mr. Silverman in his attempt to receive Step 1 accommodations and in which he provides his reasoning as to why Mr. Silverman should be entitled to these accommodations.

Mr. Silverman indicates in his personal statement that "as far back as I can remember" he struggled with reading. He states that his reading "outpaces comprehension", and as a result he needs to re-read material in order to understand it. He indicates that this is a problem in multiple everyday settings: reading subtitles in a movie, looking at a menu and reading road signs, as well as when reading journal articles, textbooks and exams. He indicates that he has "repeatedly" found it impossible to complete exams within the time limit. Despite this he was never provided with accommodations prior to college because he states, "I never had the need". I note that these appear to be contradictory statements; Mr. Silverman states that he found it impossible to complete exams within their time limit, yet he never felt that he had the need for accommodations. On the unaccommodated SAT, he states that he left sections unfinished; however, he also obtained a score of 1420 -- a score that he terms "respectable" but which I note was at approximately the 95th percentile among all college aspirants who took the exam. In my opinion a score this high could not have been achieved if substantial sections of the test were unfinished. At MUSC Mr. Silverman states that he was unaccommodated during his first semester and began receiving accommodations during his second semester. He writes that with accommodations he is able to finish exams, "usually with just seconds to spare", and that his medical school accommodations have become a "matter of survival". Mr. Silverman states that he never sought accommodations until recently because he feared "costly repercussions" for having been identified as a student with a disability, and that recent changes in the policy about "flagging" nonstandardized test administrations has resulted in a change in his perspective about accommodations. He indicates that prior to applying to medical school, his MCAT practice scores were typically above the 99th percentile, yet he scored at the 95th percentile on his only attempt at the test under standard administration conditions. He considers this difference to be indicative of a disability. However, I note that a) many, perhaps most, students perform better on untimed practice exams than on the actual unaccommodated exam, and b) Mr. Silverman scored at the 95th percentile in the absence of accommodations, which in my opinion raises questions about his claim that he left a "substantial percentage of the exam blank". I note that Mr. Silverman focuses virtually his entire statement on his claimed Reading Disorder and says little about ADHD, other than to indicate that he believes that the USMLE testing environment is such

that he would not require a separate testing environment for this condition.

Dr. Danforth conducted the first evaluation that Mr. Silverman submitted for review in December 2005 and January 2006, at which time Mr. Silverman was 21 years old and a sophomore at Skidmore College. In the history and background section of his report, Dr. Danforth indicates that Mr. Silverman was diagnosed with ADHD "early in high school", although Mr. Silverman did not submit any documentation of any evaluation leading to this diagnosis. Mr. Silverman had been prescribed multiple medications for ADHD, but at the time of testing he was not taking any. Dr. Danforth also states that Mr. Silverman reported that he experiences "severe anxiety" in the days leading up to examinations, and that at these times it is "impossible" to sleep and he engages in several compulsive behaviors prior to studying. Mr. Silverman indicated to Dr. Danforth that he "has never done well in school" and rarely reads for pleasure. He began college at Tulane University, where he obtained a 2.65 GPA in his first year of study. He then took some time off and worked as a computer programmer while taking community college courses. He then began attending Skidmore College, where he enrolled as a sophomore in the fall of 2005.

Dr. Danforth assessed Mr. Silverman's mental ability with the Wechsler Adult Intelligence Scale-III (WAIS-III). Mr. Silverman's Full Scale IQ (FSIQ=143) fell in the very superior range. His Verbal abilities (VIQ=135) and Performance abilities (PIQ=144) were both very superior. All 12 of the subtests administered yielded above average scores, including 8 that were superior or higher. Dr. Danforth assessed Mr. Silverman's achievement with the Wechsler Individual Achievement Test-II (WIAT-II). Eight subtests were administered; using age-based norms, all yielded scores at the 68th percentile or higher. Assessment of executive functioning with the Delis-Kaplan Executive Function System (D-KEFS) yielded 12 subtest scores; one was average and the remaining 11 placed Mr. Silverman in the above average range. Dr. Danforth also conducted extensive testing of Mr. Silverman's learning and memory abilities with the Wechsler Memory Scale-III (WMS-III). Among the 8 WMS-III Primary subtest scores, one was average and 7 were above average, while among the 10 Supplemental subtest scores, one was below average, 2 were average and 7 placed Mr. Silverman in the above average range. He scored in the average or higher range across tasks assessing visual-motor integration (Rey Complex Figure Test), language functioning (Boston Naming Test) and motor functioning (Grooved Pegboard). Dr. Danforth evaluated Mr. Silverman's attentional functioning with a computerized, objective measure, the Conner's Continuous Performance Test-II (CPT-II). None of the 12 scores yielded by the CPT-II was outside of normal limits, and the overall CPT-II Confidence Index was as a result only minimally suggestive of ADHD. Attention was also subjectively evaluated with a rating scale, the Brown Adult ADD Scales (BADDS). Unfortunately, Dr. Danforth does not provide any of Mr. Silverman's scores on this rating scale in his report; rather, he states that Mr. Silverman's total score was "significantly elevated". Finally, Mr. Silverman's psychological health was assessed with the Symptom Assessment-45 Questionnaire (SA-45). His responses on the SA-45 indicated a "mild elevation" in overall stress, with elevated scores noted in numerous domains including anxiety, interpersonal sensitivity, restlessness and feelings of inferiority, among others. Based on these results, Dr. Danforth diagnoses Mr. Silverman with four disabling conditions: ADHD-C, Reading Disorder (RD), Mathematics Disorder (MD) and Anxiety Disorder-Not Otherwise Specified. The RD and

3

MD diagnoses were provided despite the fact that Mr. Silverman scored at or above the 70th percentile on each of the measures of reading and math achievement in the evaluation. Such consistently strong levels of achievement cannot be considered representative of a substantial impairment in functioning associated with a disability, as is required by the Americans with Disabilities Act, as amended (ADAA). Dr. Danforth appears to have provided these two diagnoses because of the discrepancies between Mr. Silverman's achievement in these domains and his WAIS-III FSIQ, but this "discrepancy approach" to the diagnosis of learning disabilities is inappropriate for adults, for whom the ADAA criteria apply. Dr. Danforth provided the ADHD-C diagnosis despite the fact that Mr. Silverman scored consistently within the normal range on the CPT-II and mostly in the above average range across a range of tasks that are dependent on good attentional skills (e.g., the D-KEFS and the WMS-III). While Dr. Danforth indicates that Mr. Silverman's responses on the BAADS resulted in a score that was "significantly elevated", none of the scores yielded by the test were reported. Thus, Mr. Silverman apparently believes he has attention problems and he indicated that he had previously been given an ADHD diagnosis, but the results of testing provide no indication that he is substantially impaired in attentional functioning; to the contrary, the available data indicate that his attention is quite strong. The Anxiety Disorder-NOS diagnosis was apparently provided because of Mr. Silverman's reported history of severe anxiety related to testing and his self-reported mild to moderate anxiety at the time of the evaluation. Given Mr. Silverman's description of the difficulties related to his affect that he had experienced and was continuing to experience, in my professional opinion the Anxiety Disorder-NOS diagnosis was appropriate. To summarize, while Dr. Danforth diagnosed Mr. Silverman with four disabling conditions, he performed consistently at a high level across virtually all tasks presented to him and there was no evidence of any impairment in attention or learning. Mr. Silverman does appear to have been experiencing considerable levels of anxiety and in my opinion only the Anxiety Disorder-NOS diagnosis was warranted given the evaluation results.

Drs. Foster and Libet conducted the most recent evaluation submitted by Mr. Silverman in February and March 2012, at which time he was 27 years old and in his first year at MUSC. In the history section of their report, Drs. Foster and Libet write that Mr. Silverman told them that he was an 'A/B' student in elementary school without accommodations. He indicated that he was evaluated in his freshman year of high school, but did not provide any results or supply a report of this evaluation to Drs. Foster and Libet. Mr. Silverman states that his anxiety eased during college, although he experienced continuing anxiety related to tests. He was apparently unaccommodated during his freshman year of college, but utilized accommodations during his final three years. As a freshman at Tulane University, Mr. Silverman reported that he "had a fun semester" but his father pulled him out of school because of "poor grades". Following his withdrawal from Tulane, Mr. Silverman worked as a computer programmer, took flying lessons and earned straight 'A' grades at a community college (in the absence of accommodations). After enrolling at Skidmore College and completing a year there, he underwent Dr. Danforth's testing and began receiving accommodations and taking medication for attention. Drs. Foster and Libet report that Mr. Silverman scored 35 on the MCAT at the end of his Skidmore career, an excellent score that was again obtained without accommodations being provided. Mr. Silverman complained of disorganization and stated that he had been trying to improve his organization and structure recently so that he would "be able to sleep better", which I assume means that he had

been experiencing sleep problems of some sort. Drs. Foster and Libet assessed Mr. Silverman's mental ability with the Wechsler Adult Intelligence Scale-IV (WAIS-IV). Mr. Silverman's Full Scale IQ (FSIQ=141) fell in the very superior range, as had been the case in Dr. Danforth's testing nearly six years earlier. His Verbal Comprehension (VCI=138) and Perceptual Reasoning (PRI=142) index scores also placed him in the very superior range. Mr. Silverman's Working Memory (WMI=122) and Processing Speed (PSI=120) index scores were lower, but still placed him among the top 10% of his peers and fell within the superior range. Nine of the ten WAIS-IV subtests yielded above average scores, while the other fell in the upper half of the average range. In the report, Drs. Foster and Libet report Woodcock-Johnson-III (WJ-III) achievement scores based on inappropriate grade-based norms; the subsequently submitted WJ-III *'Summary and Score Report'* provides appropriate scores based on same-age peers. Five WJ-III subtests assessing reading were administered; four resulted in scores at or above the 79th percentile, while the remaining score - Reading Fluency - was low average. Three WJ-III reading Cluster scores resulted from this testing. Broad Reading (99) was average, Basic Reading Skills (117) was high average, and Reading Comprehension (125) placed Mr. Silverman in the superior range in comparison the his peers. Mr. Silverman's evaluators also administered the Nelson-Denny Reading Test (NDRT) to him. This dated test, which is intended for screening but not diagnostic purposes, uses inappropriate grade-based norms that in the case of college graduates substantially underestimate reading achievement relative to same-age peers from the general population. On the timed NDRT Vocabulary test, Mr. Silverman scored at the 12th percentile using grade-based norms. On the NDRT Comprehension subtest under standard time conditions, he obtained a score at the 1st percentile compared to other college seniors. I note that Mr. Silverman's grade-equivalent score on the Comprehension subtest was 6.3, a level that in my professional opinion is incompatible with previously obtained scores that placed him among the top few percent on the SAT and MCAT under standard time conditions. On the NDRT Reading Rate subtest, an unreliable measure in which Mr. Silverman self-reported the number of words he read in 60 seconds, he obtained a score at the 3rd percentile, again suggestive of a reading speed that is inconsistent with past performance (and performance on all other measures of reading in both submitted evaluations). Drs. Foster and Libet also reported NDRT scale scores for the subtests he administered; these scores compare the testee to the entire standardization sample that is more representative of the general population. Mr. Silverman obtained scale scores that were above the mean on Vocabulary but below average on Comprehension, while the Reading Rate scale score fell one standard deviation below the mean. When Mr. Silverman was allowed extended time on the NDRT, his score improved, as is the case for most testees, including those without disabilities. With extended time, his Vocabulary score was above average and the Comprehension score was average, again using inappropriate grade-based norms. Mr. Silverman also completed the Barkley/Murphy ADHD Symptom Scales; his responses were indicative of both childhood ADHD (Combined Type) and current ADHD (Inattentive Type). However, when his mother completed the same scales, her responses were indicative of neither childhood nor current ADHD. I note that despite Mr. Silverman's lengthy history of anxiety, Drs. Foster and Libet did not assess his affective functioning. Based on these results, Drs. Foster and Libet diagnose Mr. Silverman with ADHD-C and RD. The ADHD-C diagnosis was provided despite the fact that neither Mr. Silverman nor his mother provided responses concerning his current attentional functioning that were consistent with the disorder. Thus, in the absence of any additional subjective or objective attentional testing, in my opinion

5

the ADHD-C diagnosis was not supported. The Reading Disorder diagnosis appears to have been based primarily on the technically inadequate NDRT, which yielded several scores that are inconsistent both with Mr. Silverman's other reading scores (many of which resulted in above average scores) and his very strong past performance on timed standardized tests such as the SAT and MCAT. Importantly, Drs. Foster and Libet provide Ms. Silverman with a DSM-IV GAF (Global Assessment of Functioning) score of 75, which according to DSM-IV means: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational or school functioning (e.g., temporarily failing behind in schoolwork)." Thus, Drs. Foster and Libet believe that Mr. Silverman is experiencing only "slight" impairment in his functioning, a level of impairment that fails to reach the criteria for a disability, according to the ADAA. In considering all of these factors, in my professional opinion the results of this evaluation did not indicate that Mr. Silverman was disabled.

In Dean Self's May 12, 2016 letter to Mr. Silverman, she indicates that he has been placed on professionalism probation because of tardiness and a failure to complete assignments in a timely manner. She urges him to meet with Dr. Freedy to "develop a new behavioral monitoring contract" and strongly recommends that he comply with all terms of the contract.

Ms. Hegener writes in her October 30, 2014 'To Whom It May Concern' letter that Mr. Silverman received accommodations while a student at Skidmore College. She does not indicate the dates during which the accommodations were provided, but she does indicate that he used them "consistently".

In his May 19, 2015 letter and May 19, 2015 'Certificate of Prior Test Accommodations' form, Dr. Freedy indicates that Mr. Silverman has been accommodated with a time and one-half extended time accommodation and testing in a separate room at MUSC since March 2012.

Mr. Silverman provided for review a transcript from his four years at Dover-Sherborn Regional High School (1999-2003). He took numerous Honors and College Preparatory classes and obtained grades mostly in the 'A/B' range. No overall GPA is reported on the transcript, but I would estimate that Mr. Silverman's unweighted GPA was approximately 3.50.

Mr. Silverman submitted an 'MCAT Exam Scores' report for review. He took the MCAT in September 2010 without accommodations and obtained a score (35) that placed him at the 96th percentile overall in comparison to other medical school aspirants. Such a very strong level of unaccommodated performance in my opinion indicates that Mr. Silverman is not substantially impaired in functioning and does not require Step 1 accommodations.

In your August 30, 2016 letter to Mr. Silverman, you write that his previous accommodations request for Step 1 accommodations was denied because past evaluations had indicated that he was functioning across areas of achievement "well within the range of average" and that he was not limited in any major life activity. You also indicate to Mr. Silverman that his documentation failed to demonstrate that he had experienced a record of chronic, pervasive problems in attention. Your letter also refers to Mr. Silverman's excellent unaccommodated

performance on the SAT and MCAT as evidence that he is able to fully access the Step 1 examination without accommodations. You also inform Mr. Silverman that a diagnostic label does not establish coverage under the ADAA, and that in his case he had failed to demonstrate a substantial impairment in functioning. I agree with your conclusions and agree that the documentation he has submitted fails to demonstrate that he is currently impaired in a manner that warrants accommodations, according to the ADAA.

In his September 30, 2016 letter to you and Ms. Green, Mr. Holmes writes that Mr. Silverman has retained him following your earlier denial of his request for Step 1 accommodations. He asks that you reconsider Mr. Silverman's request and provides information that he indicates demonstrates that his client is disabled and should be accommodated. Mr. Holmes reviews the documentation I have discussed previously and then provides his legal argument that his client should be accommodated. I am not an attorney and will not attempt to address the legal points that he makes in his letter; what I have done in this letter is provide a review of the documentation submitted and my conclusions concerning Mr. Silverman's disability status.

To conclude, my careful review of all of the documentation provided by Mr. Silverman indicates that there is in my professional opinion a lack of support for his claim that he is disabled in a manner that requires a time and one-half extended time accommodation and testing over two days on the Step 1 exam. Mr. Silverman did not provide clear evidence of an impairment in functioning in early childhood, as would be expected with neurodevelopmental disorders such as ADHD-C and RD. His evaluations in both 2006 and 2012 yielded results that were generally in the above average range, a result that is inconsistent with a disabling condition according to the ADAA. Those scores that placed Mr. Silverman in the below average range were mostly from the NDRT in his 2012 evaluation, and the NDRT is a technically poor instrument that is inadequate for (and not intended for) diagnostic use. These NDRT scores were highly inconsistent with Mr. Silverman's other results from measures of reading achievement in both of his submitted evaluations. Mr. Silverman has a successful past academic record and he obtained excellent scores on administrations of the SAT and MCAT under standard time conditions; this history of unaccommodated past success in my professional opinion provides strong evidence that he is able to access the USMLE Step 1 exam without accommodations. Thus, I recommend that you deny Justin Silverman's request for a time and one-half extended time accommodation and testing over two days on the USMLE Step 1 exam. Please feel free to contact me if I may provide you with any additional information regarding Mr. Silverman's request for USMLE Step 1 accommodations.

Sincerely;

*/By typing my name below I am confirming my intent to sign this document on 10/10/2016/*

Steven G. Zecker, Ph.D.
Clinical Psychologist