IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Justin Silverman, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 2:16-cv-03686-RMG |
| ) | |
| National Board of Medical Examiners, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DECLARATION OF BENJAMIN J. LOVETT, PH.D.**

1. My name is Benjamin J. Lovett. I am over 18 years of age and, unless otherwise stated, I have personal knowledge of the matters addressed herein.

2. I am an Associate Professor of Psychology at State University of New York (SUNY) Cortland and an Adjunct Professor of Psychology at Syracuse University. I am a licensed psychologist. A true and correct copy of my curriculum vitae is attached at Tab A.

3. My professional expertise is in the diagnosis and performance of individuals with known or suspected neurodevelopmental conditions, particularly learning disabilities (LD) and Attention Deficit-Hyperactivity Disorder (ADHD). I have published numerous articles and book chapters and delivered many paper presentations on these topics. Much of my research involves testing accommodations for students with disabilities, and I have published a book on that topic. As part of my work, I frequently meet with young adults who have diagnoses of learning and attention problems, and I assess both their self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning.

4. In addition to my faculty and research responsibilities, I have served as an independent reviewer for numerous organizations that administer or rely upon standardized tests, including the National Board of Medical Examiners (NBME), the National Board of Osteopathic Medical Examiners (NBOME), and the New York State Board of Law Examiners. For each of these organizations, among others, I have reviewed documentation submitted by examinees seeking testing accommodations based, at least in part, on ADHD and/or LD diagnoses.

5. It is a common practice for testing entities to seek input from external experts regarding disability-based requests for testing accommodations. The external professionals have expertise in the areas of impairment that provide the basis for an accommodation request. The external professionals are asked to review documentation submitted in support of an accommodation request and to advise on matters of disability assessment and diagnosis, level of functional impairment experienced by an applicant, and the appropriateness of specific test accommodations in a given case. This practice is similar to the process used in other contexts where benefits are provided if a person meets a given definition of disabled. Examples include requests for disability benefits under federal and state programs, and requests for academic accommodations by college and university students. The practice of reviewing supporting documentation and providing an opinion based upon that documentation is both well established and professionally sound. It is especially appropriate in the case of diagnoses involving ADHD or LD, because so much of the diagnosis relies on clinical and academic histories, not observations in a clinician's office.

6. Ideally, each professional would have access to the same or similar clinical and academic information so as to make the best possible accommodation decision for an applicant. That is why testing agencies and external reviewers ask for as much documentation as is

reasonably available to support a diagnosis and to delineate the applicant's functional limitations. For cognitive impairments, certain documentation is routinely expected (*e.g.*, school records of a learning disability or medical records on ADHD or a brain injury), and reviewers will generally ask to have such materials submitted. By reviewing a complete historical record, an evaluator can determine whether an individual has evidence to support the disability diagnosis and to demonstrate that the individual is substantially limited in one or more major life activities.

7. Individuals who are substantially limited in a major life activity due to an LD or ADHD generally have extensive documentation in their academic and/or employment histories, and in their medical records, reflecting such substantial limitations, because both categories of impairment have childhood onsets. There are many such students in our schools today with learning disabilities and/or ADHD, and most of them have school records from early grades forward that show: the extent of their skill deficits (in reading, writing, or math) and/or behavior problems. It is thus typical for students with a reading disorder or other LD and students with ADHD to have an historical record of their disability and resulting impairment.

8. The current official diagnostic criteria for ADHD found in DSM-5 require that someone have unusually high levels of symptoms of inattention and/or hyperactivity/impulsiveness that begin in childhood (by age 12), occur across settings, and interfere with functioning in real-world settings. In addition, the symptoms should not be better explained by a different disorder (e.g., an anxiety disorder). Typically, young adults with valid ADHD diagnoses can point to evidence of their disorder that includes ratings of their symptoms by other parties who know them well (e.g., parents, friends, significant others), documented problems in school (e.g., low grades, problem behavior, or difficulty completing tasks and

complying with teacher requests), and significant difficulties with current everyday life responsibilities.

9. The current official diagnostic criteria for LD require that someone have academic skills that are clearly below the average range and that cause problems performing in real-world settings. These academic skill weaknesses were present in the person's childhood and are not better accounted for by other factors (e.g., general low intelligence). Typically, young adults with valid LD diagnoses can point to evidence of their disorder that includes report cards from their K-12 schooling showing low grades in the area of their LD (e.g., reading), special education records showing the specialized instruction and related services they were provided, and reports from professional evaluations showing below-average scores on diagnostic achievement tests in the area of their LD.

10. I was asked by NBME to do an independent review of the file of materials that Justin Silverman submitted to NBME in support of his request for testing accommodations on Step 1 of the USMLE. I reviewed: (a) a report from a diagnostic evaluation completed by Thomas Danforth, Ph.D., in 2005/6; (b) a report from a diagnostic evaluation completed by Shantee Foster, Ph.D., in 2012; (c) additional test score data from the 2012 diagnostic evaluation; (d) Mr. Silverman's score report on the Medical College Admission Test (MCAT) in 2010; (e) a letter dated May 19, 2015 from John R. Freedy, MD, Ph.D., Associate Dean for Student Affairs at the Medical University of South Carolina; (f) a letter dated October 30, 2014 from Meg Hegener, Coordinate of Students Access Services, Office of Student Academic Services, Skidmore College; and (g) a letter dated May 18, 2015, from Justin Silverman addressed to NBME.

11.     I prepared a report for NBME based on my review of this information. A true and correct copy of my June 13, 2016 report is attached at Tab B. I have reviewed this report and reaffirm my belief in the opinions expressed therein.

12.     When applicants request testing accommodations, it is often helpful to examine their performance on similar tests in the past where they did *not* receive accommodations. In Mr. Silverman's case, one of the most important pieces of documentation in his record is his score report from the Medical College Admission Test (MCAT). The MCAT is a rigorous admission test taken by those applying for entry into medical school. The test has a strict time limit, and Mr. Silverman took the test without any accommodations – i.e., under standard time conditions. One of the MCAT sections, "Verbal Reasoning," involves reading passages and answering questions about the passages under the applicable strict time limit. Compared to other medical school applicants, Mr. Silverman's score on that section of the test was at the 95th percentile— that is, his performance was in the top 5% of all medical school applicants taking that test (a group that is well above-average compared to the general population). This score is strong evidence that he does not need any accommodations to access reading-based tests as well as most people. Step 1 of the USMLE is similar in format to the Verbal Reasoning section of the MCAT, and the same skills are required to access both tests (*i.e.,* being able to read and understand text under time constraints).

13.     Mr. Silverman's most recent evaluator, Dr. Shantee Foster, recommended that he receive extended time accommodations. However, this was based on Mr. Silverman's performance on certain diagnostic tests that cannot be objectively viewed as representing his genuine skill levels. One test administered by Dr. Foster was the Nelson-Denny Reading Test (NDRT). On the standard time reading comprehension task from the NDRT, Mr. Silverman's

performance was in the bottom 1% of college seniors. According to the manual for this test, a score at that level would mean that Mr. Silverman's reading comprehension skills are equivalent to those of a *sixth grader* under standard time limits. This result cannot be taken at face value, particularly given Mr. Silverman's performance on the Verbal Reasoning section of the MCAT, which requires skills similar to those measured by the NDRT reading comprehension task; both require the examinee to read passages and answer comprehension questions about the passages under a time limit. Mr. Silverman performed in the top 5% on the MCAT Verbal reasoning test, but no sixth grader could do so. Mr. Silverman's other NDRT scores are also inexplicably discrepant from his performance on the MCAT. It is not clear why Dr. Foster did not question or further explore Mr. Silverman's performance on the NDRT given her knowledge of his performance on the MCAT (which she mentions near the beginning of her report).

14.    Dr. Foster also noted that on the NDRT, Mr. Silverman's performance improved when he was given additional time. As I discussed above, there is good reason to doubt that Mr. Silverman's NDRT scores accurately represent his skills. However, even if I assumed that the NDRT scores are valid, benefiting from extended time on the NDRT is not indicative of a disability. Indeed, the NDRT manual makes clear that many of the people who the test was standardized on did not complete the NDRT under the standard time limit, so they would have benefited from extended time as well. More generally, research has repeatedly found that nondisabled students often benefit significantly from extended time accommodations, when a test is time-pressured.

15.    Mr. Silverman was first diagnosed with a reading disability during his 2005/6 evaluation by Dr. Thomas Danforth. However, all of Mr. Silverman's reading scores from that evaluation were in the average range or above. There was absolutely no evidence of limitations

- 6 -

in reading compared to most people in the general population. It appears that Dr. Danforth made the reading disability diagnosis because Mr. Silverman obtained certain reading scores that were below his (even higher) IQ; this diagnostic approach (often called "discrepancy analysis") is known to be an unreliable and invalid way to diagnose reading disabilities, but even if a diagnostician insists on using it, it clearly cannot indicate whether someone is substantially impaired in reading compared to most people.

16.     On all sections of the MCAT, Mr. Silverman's scores were in the average range or above, in comparison to the other medical school applicants who took the test. Moreover, these scores appear to have been typical of Mr. Silverman's real-world functioning without any accommodations. On the SAT college admissions test, Mr. Silverman reportedly obtained a score of 1420, which would be well above the average range, likely in the top 5% of college-bound high school seniors. He also reportedly obtained mostly good grades prior to college, and there is no evidence (or even self-reports) of low grades at his primary undergraduate institution, Skidmore College.

17.     I understand that Mr. Silverman has reported having extremely severe problems with reading. For instance, in his letter to the NBME, he reported being generally unable to read well enough to understand road signs or even restaurant menus in a reasonable amount of time. His perceptions of his own reading skills are certainly important to consider clinically, but they must be judged against objective data, especially from real-world settings. Although Mr. Silverman may have genuine negative perceptions of his own reading skills, his performance on timed real-world reading tests has been not just adequate, but exceptionally high, compared to most people.

18.     I have reviewed over 600 applications for accommodations on different types of tests. Mr. Silverman's application is not a borderline case. His documentation instead contains credible and powerful evidence *against* any need for accommodations to access tests as well as most people in the general population can.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 2, 2016.