

**User Name:** Rebecca Wolfe
**Date and Time:** Dec 15, 2016 11:56
**Job Number:** 40893693

## Document (1)

1. *Roberson v. Paul Smith, Inc., 2011 U.S. Dist. LEXIS 16553*
    **Client/Matter:** -None-
    **Search Terms:** 2011 U.S. Dist. LEXIS 16553
    **Search Type:** Natural Language

🛑 Warning
As of: December 15, 2016 11:56 AM EST

# [Roberson v. Paul Smith, Inc.](#)

United States District Court for the Eastern District of North Carolina, Western Division

February 18, 2011, Decided; February 18, 2011, Filed

No. 5:07-CV-284-F; No. 5:08-CV-40-F

**Reporter**
2011 U.S. Dist. LEXIS 16553 *; 2011 WL 683900

TRISHA L. ROBERSON, Plaintiff, v. PAUL SMITH, INC.; NORTH CAROLINA DIGITAL IMAGING, INC.; PAUL SMITH, SR.; and PAUL SMITH, JR., Defendants. TRISHA L. ROBERSON, Plaintiff, v. PAUL SMITH, INC. and NORTH CAROLINA DIGITAL IMAGING, INC., Defendants.

**Subsequent History:** Vacated by, in part, Motions ruled upon by, Remanded by, in part [Roberson v. Paul Smith, Inc., 2011 U.S. Dist. LEXIS 42978 (E.D.N.C., Apr. 20, 2011)](#)

**Prior History:** [Roberson v. Paul Smith, Inc., 2010 U.S. Dist. LEXIS 56636 (E.D.N.C., June 9, 2010)](#)

## Core Terms

terminated, seal, offers, Defendants', parties, entry of final judgment, employees, proffered, motions, days, dispatch, cases, exhibits, reasons, notice, scans, summary judgment motion, documents, workers' compensation, clerk of court, Digital, Imaging, sick, protected activity, deficiencies, causation, contends, retaliation, adjudicate, records

## Case Summary

### Overview

The issues of whether the employee was terminated because she indicated she would file a workers' compensation claim, and whether the employer would have terminated her employment regardless of the filing of any claim, had to be decided by the jury. However most of the exhibits the employee sought to seal were confidential medical records subject to the Health Insurance Portability and Accountability Act as codified in [45 C.F.R. § 164.501 et seq.](#) As such, they were not public records and were prohibited from disclosure by federal law.

### Outcome

The motion for summary judgment was denied. The motion to file exhibits was allowed and the motions for entry of final judgment were allowed.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

[**HN1**](#) Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

[**HN2**](#) With regard to a motion for summary judgment, where the moving party bears the burden of proof as to an issue, such as an affirmative defense, it may prevail on its motion for summary judgment and establish an affirmative defense when it has produced credible evidence—using any of the materials specified in [Fed. R. Civ. P. 56(c)](#)—that would entitle it to a directed verdict at trial. When the defendant produces such evidence supporting its affirmative defense, the burden of production shifts back to the plaintiff who must come forward with specific facts showing that there is a genuine issue for trial.

Workers' Compensation & SSDI > Coverage > Actions Against Employers > Retaliatory Discharge Actions

*HN3* The North Carolina Retaliatory Discharge Act (REDA), *N.C. Gen. Stat. § 95-240 et seq.*, prohibits discrimination or retaliation against an employee for, among other things, filing or threatening to file, a workers' compensation claim. *N.C. Gen. Stat. § 95-241*. To establish a claim under the REDA, a plaintiff must proffer evidence showing that (1) she exercised her right to engage in an activity protected under the statute; (2) she suffered a retaliatory action, and (3) a causal connection exists between the exercise of the protected activity and the alleged retaliatory action. Under the REDA, an employer may assert an affirmative defense by proving by the greater weight of the evidence that it would have taken the same unfavorable action in the absence of the protected activity of the employee. *N.C. Gen. Stat. § 95-241(b)*.

Workers' Compensation & SSDI > Coverage > Actions Against Employers > Retaliatory Discharge Actions

*HN4* To establish the causation element of a North Carolina Retaliatory Discharge Act (REDA), *N.C. Gen. Stat. § 95-240 et seq.*, claim, courts have held that a plaintiff may, under certain circumstances, proffer evidence of a "close temporal proximity" between her protected activity and the adverse employment action.

Workers' Compensation & SSDI > Coverage > Actions Against Employers > Retaliatory Discharge Actions

*HN5* Under the North Carolina Retaliatory Discharge Act (REDA), *N.C. Gen. Stat. § 95-240 et seq.*, an employer bears the burden of persuasion—not just production—of showing that they would have taken the same unfavorable action in the absence of the protected activity of the employee under a preponderance standard. *N.C. Gen. Stat. § 95-241(b)*.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

*HN6* In federal discrimination and retaliation cases, courts have held that offering different justifications at different times may be evidence of pretext.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Circumstantial & Direct Evidence

*HN7* Direct evidence of the employer's state of mind when making the contested employment decision is unlikely, so evidence of how the employer has treated similarly situated employees in the past and how it was treating them at the time of the discharge may be the best indication, other than the testimony of the parties themselves, of the rationale of the employer.

Constitutional Law > Bill of Rights > Fundamental Freedoms > General Overview

*HN8* Prior to sealing court documents, a district court must first determine the source of the public's right to access the documents: the common law or the *First Amendment*. The United States Court of Appeals for the Fourth Circuit has determined that the *First Amendment* right of access attaches to documents filed in support of a summary judgment motion. Where the *First Amendment* guarantees access to documents, such access may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest.

Constitutional Law > Bill of Rights > Fundamental Freedoms > General Overview

*HN9* With regard to a motion to seal, in weighing the competing interests, a court must comply with the procedure set forth by In re Knight Publishing Company. First, a court must give the public notice of a request to seal and a reasonable opportunity to challenge it. Although individual notice is not necessary, a court must notify persons present in the courtroom of the request, or docket it "reasonably in advance of deciding the issue." A court must consider less drastic alternatives to sealing, and if it decides to seal documents, it must state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review.

Civil Procedure > Settlements > Offers of Judgment > Making of Offers

*HN10* *Fed. R. Civ. P. 68* provides, in part, the following: (a) Making an Offer; Judgment on an Accepted Offer. More than 10 days before the trial begins, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. If, within 10 days after being served, the opposing party serves written notice accepting the offer, either party may then file the offer and notice of acceptance, plus proof of service. The clerk must then enter judgment.

Civil Procedure > Settlements > Offers of Judgment > General Overview

*HN11* The plain purpose of *Fed. R. Civ. P. 68* is to encourage settlement and avoid litigation. Still, as the terms of *Rule 68* make clear, not all settlement offers by defendants satisfy *Rule 68*. Specifically, a *Rule 68* offer is not merely to settle the suit; it must be to permit judgment on specified terms. The critical feature of the Rule is that the offer be one that allows judgment to be taken against the defendant for both the damages caused by the challenged conduct and the costs then accrued. In other words, the drafters' concern was not so much with the particular components of offers, but with the judgments to be allowed against defendants.

Civil Procedure > Settlements > Offers of Judgment > Making of Offers

*HN12* As the plain terms of *Fed. R. Civ. P. 68* make clear, in most instances once a party files both the offer of judgment and the notice of acceptance, along with proof of service, the clerk of court enters judgment, without any further action from the court. As at least one other court has recognized, however, *Rule 68* is silent as to the effect of an offer of judgment that does not dispose of all the claims in a case. Some courts are not troubled by this silence, and believe that any accepted offer of judgment—whether it resolves all the claims in the litigation or not—requires the clerk of court to enter judgment. Other courts, however, believe that when an accepted offer of judgment fails to resolve all claims in a case, *Fed. R. Civ. P. 54* then comes into play.

Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties

*HN13* *Fed. R. Civ. P. 54* provides, in part: when an action presents more than one claim for relief the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all claims or the rights and liabilities of fewer than all parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities. *Fed. R. Civ. P. 54(b)*

Civil Procedure > Settlements > Offers of Judgment > Making of Offers

Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties

*HN14* Interpreting *Fed. R. Civ. P. 68* in light of *Fed. R. Civ. P. 54*, it appears that if an offer of judgment does not include all claims and all parties, it is not automatically self-executing, and the clerk does not automatically enter judgment. Rather, a court may, pursuant to *Rule 54(b)*, direct entry of final judgment as to fewer than all claims.

Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties

*HN15* Typically, when engaging in a *Fed. R. Civ. P. 54(b)* analysis, a district court is determining whether to enter final judgment as to one or more but fewer than all claims in a multiclaim action, thus allowing an appeal on fewer than all claims in a multiclaim action. In so deciding, a district court first determines whether the judgment is final in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action. Then, a court must determine whether there is no just reason for delay in the entry of judgment. The factors a court typically considers when determining the "no just reason" for delay issue include: (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of the competing claims, expense, and the like.

Civil Procedure > Settlements > Offers of Judgment > Making of Offers

*HN16* The plain terms of *Fed. R. Civ. P. 68* provides that a defendant may serve on an opposing party an offer to allow judgment on specified terms.

Civil Procedure > Settlements > Offers of Judgment > General Overview

*HN17* *Fed. R. Civ. P. 68* has several unique features that distinguish it from other means of compromise and settlement in civil litigation, the most important being "its cost-shifting provision." Under the cost-shifting position, if a plaintiff rejects an offer of judgment, and if she does not ultimately obtain a judgment more favorable than the offer, she must then pay the costs incurred after the offer is made. The cost-shifting provision essentially

"shifts the risk of going forward with a lawsuit to the complainant, who becomes exposed to the prospect of being saddled with the substantial expense of trial, and serves as the sword which encourages plaintiffs to settle.

**Counsel:** [*1] For Trisha L. Roberson, Plaintiff: John E. Campion, LEAD ATTORNEY, Raleigh, NC.

For Paul Smith, Inc., North Carolina Digital Imaging,Inc., Paul Smith, Sr., Paul Smith, Jr., Defendants: Allison Serafin, Patricia L. Holland, LEAD ATTORNEYS, Jackson Lewis LLP, Cary, NC.

**Judges:** JAMES C. FOX, Senior United States District Judge.

**Opinion by:** JAMES C. FOX

## Opinion

ORDER

This matter is before the court on the following motions: Plaintiff's Motion for Entry of Final Judgments in Case No. 5:07-CV-284-F [DE-52]; Plaintiff's Motion for Entry of Final Judgments in Case No. 5:08-CV-40-F [DE-54]; Plaintiff's Motion for Entry of Final Judgments in Case No. 5:07-CV-284-F [DE-56]; Plaintiff's Motion for Entry of Final Judgment in Case No. 5:08-CV-40-F [DE-58]; Defendants' Motion for Summary Judgment [DE-66], and Plaintiff's Motions to Seal [DE-75; 76].

**I. PROCEDURAL HISTORY**

**A. Initiation of Cases**

On June 25, 2007, Plaintiff filed a Complaint in the North Carolina General Court of Justice, Superior Court Division, Johnston County alleging the following claims against Defendants Paul Smith, Inc. ("PSI"), North Carolina Digital Imaging, Inc. ("NCDI"), Paul Smith Sr., and Paul Smith Jr.:

- Failure to pay overtime in violation of 29 U.S.C. § 207(a);

- [*2] Failure to pay overtime in violation of N.C. Gen. Stat. 95-25.4

- Failure to pay wages when due in violation of N.C. Gen. Stat. § 95-25.6 and N.C. Gen. Stat. § 95-25.7

Defendants timely filed a Notice of Removal [DE-1] in this court, asserting this court could exercise federal question jurisdiction over Plaintiff's claim for the violation of 29 U.S.C. § 207(a), and supplemental jurisdiction over the remaining state law claims. Once removed, the caption to this case became 5:07-CV-284-F.

Before Defendants filed a responsive pleading to the Complaint, Plaintiff filed her First Amended Complaint, and alleged the following two additional claims against Defendants PSI and NCDI (hereinafter, "the Corporate Defendants"):

- Retaliatory discharge in violation of the North Carolina Retaliatory Discharge Act, N.C. Gen. Stat. § 95-240 et seq. ("REDA"), and

- Wrongful discharge in violation of the public policy of North Carolina for pursuing her rights under the Worker's Compensation Act

Defendants responded by filing an Answer to the Amended Complaint and filing a Partial Motion to Dismiss, seeking the dismissal of Plaintiff's retaliatory discharge, wrongful discharge, Fair Labor Standards Act ("FLSA") [*3] and North Carolina Wage and Hour Act claims.

On December 21, 2007, Plaintiff filed a second Complaint in the North Carolina General Court of Justice, Superior Court Division, Johnston County against the Corporate Defendants alleging:

- Sexual harassment in violation of Title VII and

- Retaliation in violation of Title VII

Defendants removed Plaintiff's Second Complaint to this court, on the basis of federal question jurisdiction and answered the Complaint. Once removed to this court, the caption of the second action became 5:08-CV-40.

On May 16, 2008, the parties filed a joint motion to consolidate the two actions because all the claims arose out of a common set of facts. This court allowed the joint motion on May 21, 2008.

On March 31, 2009, the court allowed in part Defendants' Partial Motion to Dismiss, and dismissed Plaintiff's claim for the alleged violation of N.C. Gen. Stat. § 95-25.4 as to NCDI and PSI, but not as to Paul Smith, Sr., or Paul Smith, Jr.

**B. Defendants' Offers of Judgment to Plaintiff and Plaintiff's Acceptances**

On August 26, 2009, pursuant to *Federal Rule of Civil Procedure 68*, Defendants presented several offers of judgment to Plaintiff in an attempt to dispose of Plaintiff's [*4] remaining claims in this case. On September 1, 2009, Plaintiff accepted offers of judgment tendered by Paul Smith, Sr., and Paul Smith, Jr. (collectively, "the Individual Defendants") for the following claims:

- Plaintiff's claim of violation of FLSA, *29 U.S.C. § 207(a)*

- Plaintiff's claim of violation of *N.C. Gen. Stat. § 95-25.4*

- Plaintiff's claim of violation of *N.C. Gen. Stat. § 95-25.6*

- Plaintiff's claim of violation of *N.C. Gen. Stat. § 95-25.7*

That same date, Plaintiff also accepted the offers of judgment against the Corporate Defendants for the following claims:

- Plaintiff's claim for violation of *N.C. Gen. Stat. § 95-25.6*

- Plaintiff's claim for violation of *N.C. Gen. Stat. § 95-25.7*

- Plaintiff's claim for wrongful discharge in violation of public policy

- Plaintiff's Title VII claim for sexual harassment

- Plaintiff's Title VII claim for retaliation

Plaintiff filed Notices of her acceptances with the court.

As a result of Plaintiff's acceptance of the offers of judgment, the parties continued to litigate only two claims against the Corporate Defendants: Plaintiff's claims for retaliatory discharge in violation of *N.C. Gen. Stat. § 95-240 et seq.* and for violation of FLSA, *29 U.S.C. § 207(a)*. [*5] No claims against the individual Defendants continued to be litigated.

Defendants represent that immediately upon receiving Plaintiff's acceptances of Defendants' offers of judgment, Defense counsel contacted Plaintiff's counsel and inquired as to whether Plaintiff would stipulate to the dismissal, with prejudice, of the nine claims for which she accepted Defendants' offers of judgment.

Defendants also represent that their counsel explained that to Plaintiff's counsel that Defendants would expedite payment to Plaintiff as soon as the parties stipulated to the dismissal of the claims, with prejudice, and executed a release of these claims against Defendants.

Defendants represent that Plaintiff's counsel refused to stipulate to the dismissal of the nine claims for which Plaintiff accepted Defendants' offers of judgment and also refused to enter into a release of any claims. According to Defendants, Plaintiff's counsel advised that Plaintiff was prepared to treat certain accepted offers of judgment as admissions or adjudications against the Defendants which would extend liability to the remaining Corporate Defendants. Defendants also represent that Plaintiff's counsel insisted that the [*6] filing of her acceptances with the court would perfect "judgments" which would have the same effect as "adjudications on the merits on the claims," and directed to Defense counsel to issue separate checks for each offer of judgment.

Defense counsel represent they sought the advice of the Clerk of Court for the Eastern District of North Carolina as to Defendants' responsibility to proffer payment where the opposing party refused to enter into a stipulated dismissal with prejudice of claims and release of claims. According to Defendants, the Clerk of Court indicated that it was the practice in this district for the parties to stipulate to the dismissal, with prejudice, of the claims for which a plaintiff accepted a defendant's offer of judgment. According to Defendants, the Clerk of Court, upon hearing of Plaintiff's opposition to the practice, directed the parties' attention to *Rule 54(b) of the Federal Rules of Civil Procedure* but cautioned that without knowing more about the case, the rule may not apply, and in any event, the decision to enter final judgment would be within the discretion of the court.

The parties then engaged in discovery on the remaining two claims. On April 15, 2010, [*7] Plaintiff filed a Stipulation of Dismissal as to her FLSA claim. On May 6, 2010, Plaintiff filed two motions [DE-52; DE-54] requesting that the court enter final judgment on all but one of the claims for which she previously accepted offers of judgment made by the Defendants. After receiving a Notice of Deficiency directing her to refile the motions, Plaintiff filed two additional motions [DE-56; DE-58] seeking identical relief.

Defendants, on May 27, 2010, filed a motion for summary judgment on the sole claim still being actively

litigated by the parties: Plaintiff's claim against the Corporate Defendants for retaliatory discharge under REDA. In connection with her Response to the motion for summary judgment, Plaintiff filed a motion to seal certain exhibits.

## II. STATEMENT OF THE FACTS

Plaintiff Trisha Roberson began working as a mobile radiographic technologist for Defendant PSI in July 2005. Plaintiff contends that she was jointly employed by PSI and Defendant NCDI. Defendants dispute that characterization.

### A. Relationship between Defendants

Defendant Paul Smith, Sr., is the sole owner of PSI, and has been since its founding in 1999. PSI's primary business at the times relevant to this **[*8]** action was managing Defendant North Carolina Digital Imaging, Inc. ("NCDI"). Paul Smith, Sr.'s brother, Durward A. Smith, originally owned NCDI.

According to Defendants, NCDI owned mobile digital imaging equipment, specifically mobile digital imaging vans. Pursuant to an agreement between NCDI and PSI, the latter company managed the day-to-day business of the former. PSI provided dispatch employees, x-ray technicians, and office employees to NCDI. NCDI, using the leased personnel of PSI, provided mobile radiographic scans to various retirement facilities throughout North Carolina. Pursuant to the agreement, PSI supervised the employees leased to NCDI and handled billing for NCDI. PSI was never paid for its services under the contract.

Paul Smith, Sr., and Durward Smith both had signatory authority on the bank account for NCDI. Paul Smith, Sr., testified that he handled the day-to-day problems and issues that arose with the management of NCDI, but that Durward Smith still maintained a role in some decisions. Paul Smith, Sr., also testified that he needed to get Durward Smith's assent before hiring or firing any employees.

After Plaintiff's employment was terminated, Paul Smith, Jr, purchased **[*9]** NCDI from his uncle. Prior to the purchase, Paul Smith, Jr. served as vice president of marketing for PSI. At some time in 2008, NCDI hired its own employees, and has operated independently from PSI.

The court observes that in her First Amended Complaint, Plaintiff alleges that NCDI and PSI were her employers, individually and jointly. *See* First Amend. Compl. [DE-8] ¶ 10. In their Answer, Defendants expressly stated "[I]t is admitted that N.C. Digital Imaging, Inc. employed Roberson during the relevant time period of Plaintiff's Complaint." Answer [DE-9] ¶ 10. Defendants did not admit that PSI employed Plaintiff. Defendants now contend their answer was incorrect. They have not, however, yet moved to amend it.

### B. Plaintiff's history of employment

During her employment which is the subject of this suit, Plaintiff lived in Cary, North Carolina, and was dispatched in a mobile digital imaging van to various retirement facilities in North Carolina to take radiographic scans. She was assigned to work four shifts per week, for a total of sixteen days total per month. Plaintiff's scheduled working hours were 8 a.m. to 8 p.m.

According to Defendants, in or about December 2006, their business substantially **[*10]** increased and Plaintiff began to refuse calls from the dispatcher, stating that she refused to work past 6:30 p.m. Employees who worked as dispatchers state that Plaintiff's refusal to take calls created chaos and required them to scramble to find other technicians who could cover the call. These employees also contend that due to Plaintiff's refusal to take calls, they often had to call facilities to see if a scheduled scan could be "rolled over" to the following day.

Around this same time period, Plaintiff signed up to work on Christmas Day in December 2006. Each technician was responsible for choosing one holiday to work, and in exchange the shift hours were shortened to 9 a.m. to 6 p.m. and the company paid overtime for the entire shift. According to Defendants, Christmas Day was work generally was viewed as an easy way to be paid time and one-half without having to take many, if any, calls, because it generally was the slowest day of the year. The only calls accepted by Defendants on holidays are STAT calls: calls which must be completed within two hours. As the most senior technician, Plaintiff got to choose which holiday she worked, and she chose Christmas Day.

On that day, Plaintiff **[*11]** was called to work one call, and she completed it. Defendants assert Plaintiff refused to complete a second call, stating she was going home to be with her family. The dispatch employee had to find another technician to cover Plaintiff's call, and also call facilities to explain their calls would be delayed. Paul Smith, Sr., contends he spoke

to Plaintiff on the phone a few days later, expressing his displeasure. No notes of this warning were placed in Plaintiff's personal file.

On January 24, 2007, Roberson injured her shoulder when she loaded an x-ray machine into her van after finishing an assignment. Plaintiff contends she called her supervisor, Candy Peters, on January 25, 2007, to tell her she was going to the doctor for her injury. Plaintiff also contends she spoke to Peters after her doctor's appointment, to inform her that she needed to be out for a few days because she was told not to lift the x-ray machine in and out of the NCDI van. Plaintiff testified that Peters suggested that Plaintiff keep her nine-year old daughter home from school so she could lift the machine in and out for Plaintiff. Plaintiff was out of work on January 25th and 26th due to her injury.

On January [*12] 30, 2007, Plaintiff provided Peters with information regarding the injury, and Peters filled out the report required by the North Carolina Industrial Commission, "Form 19: Employer's Report of Employee's Injury or Occupational Disease to the Industrial Commission." Peters then faxed the form the same day. The form listed NCDI as Plaintiff's employer.

Defendants contend that in February 2007, Plaintiff's conduct and attendance problems increased significantly. Specifically, dispatch employees recall Plaintiff refusing to take calls assigned to her; Plaintiff refusing to work Thursday or Friday evenings before her days off; Plaintiff ignoring messages from dispatch which assigned calls; dispatch employees being unable to locate Plaintiff for three to four hours during her shifts; Plaintiff's scans having to be repeated more than those of any other technician, and demanding that a marketing representative ride with her to do her work in various areas. A dispatch employee has testified, via an affidavit, that Plaintiff failed to complete a full shift on ten of her sixteen scheduled days in February. Defendants also contend that Plaintiff repeatedly failed to perform timely STAT calls. Defendants [*13] further contend that when Plaintiff did perform STAT calls, the scans often were suboptimal.

Peters, Plaintiff's supervisor, remembers giving Plaintiff a verbal warning, but she does not remember when she gave that warning. She also remembers having "several conversations" with Plaintiff about her performance during that time period, but she cannot remember if during those conversations she indicated to Plaintiff that she had violated company policy. Paul Smith, Sr., the owner of PSI, remembers telling Plaintiff about complaints he had received about scans she had taken. Plaintiff, however, does not remember receiving any counseling from either Paul Smith, Sr., or Peters regarding her work performance. Her personnel file does not contain records of counseling, disciplinary action, or other indications of unsatisfactory performance.

Defendants contend that pursuant to previous plans, Peters performed audits/evaluations of all technicians during the first quarter of the 2007 calendar year. Defendants maintain that the audit/evaluation was not used to discipline a tech; rather, it was a tool used to assess an individual tech's performance and to work with those techs whose performance was [*14] substandard. Peters performed Plaintiff's evaluation on February 28, 2007. In the evaluation, Peters rated the "film quality" of Plaintiff's scans to be "unsatisfactory" and commented that Plaintiff "need[s] to obtain better quality of films, with better positioning."

In a letter dated February 28, 2007, Paul Smith, Sr., informed Plaintiff that effective March 3, 2007, she was terminated from employment. The letter read:

> Dear Trish,
>
> This letter is to inform you that effective March 3rd, NCDI will no longer need your services. We will in fact owe you some vacation which I will send you next week. I have enclosed reasons for your dismissal, although I am sure that you are aware of them.
>
> In checking Christmas day with all our employee's [sic] you made the statement that you would not work all day because you wanted to spend time with your family, although you agreed to work. You made one call in Burlington and refused to do the others.
>
> You were paid Christmas day at the regular pay and given 2 ½ hours OT for the trip to Burlington.
>
> Our business has suffered because of you refusing to work your scheduled hours each week, so this change is necessary.

Ex. 6, Feb. 28, 2007 Letter [DE-67-8]. Attached [*15] to the letter was the audit/evaluation prepared by Peters and a memorandum of "occurrences", prepared by Peters at Smith, Sr.'s direction, which listed instances where Plaintiff called out sick or refused to do cases

Specifically, the memorandum listed, in pertinent part,

the following:

> Trish Robertson
>
> Occurrences
>
> Beginning 12-28-2006 to current
>
> 12/28/2006—Trish called out sick—(Thursday)
>
> 12/29/2006—Trish called out sick—(Friday)
>
> 1-2-07 Trish called out sick —Vertigo(Tuesday)
>
> 1-3-07 Trish called out sick—Vertigo(Wednesday)
>
> 1-4-07 Trish called out sick—Vertigo (Thursday) 1-3, 4, 5 2007
>
> Trish had a doctors note
>
> 1-5-07 Trish parked van @ Molly's, Marc had to go and meet with her to complete 2 cases @ Pettigrew(Friday)
>
> 1-10-2007—Trish left early @ 6:30 p.m., refused to do any more cases (Wednesday)
>
> 1-16-2007—Trish left early @7:00 p.m. refused to do any more cases (Tuesday)
>
> 1-25-2007 Trish left early ½ day, sick could not do any more cases. (Thursday)
>
> 1-26-2007 Trish called out sick (Friday)
>
> 2-02-2007 Trish left @11:00, child sick (Friday)
>
> During all of these times, we had to either cover or roll cases over as a result, which has created unfavorable results in and around the surrounding Raleigh area.

"Occurrences [*16] Memorandum" [DE-67-8]. Plaintiff contends this memorandum contains a number of inaccuracies.

Specifically, Plaintiff contends that Defendants' records show that she in fact worked on December 28-29, 2006, and did not call out sick. When confronted with the records during her deposition, Peters admitted that it appeared that Plaintiff had worked those days in December. Plaintiff also notes that the dispatch logs do not show that she was assigned any cases at Pettigrew on January 5, 2007, and she questions the veracity of that "occurrence." Plaintiff further asserts she did not refuse work given to her by dispatch. Finally, Plaintiff notes that January 25-26 she was out, with a doctor's note, due to the injury she sustained during the course of her employment.

Paul Smith, Sr., has given slightly differing testimony about who made the actual decision to terminate Plaintiff's employment. He has testified that his brother, Durward Smith, made the decision to terminate Plaintiff's employment, and that he agreed with the decision. He also testified that he, his brother, and Peters jointly agreed that Plaintiff needed to be fired. He also testified that it was his decision, but he had his brother's [*17] blessing. In any event, it is undisputed that Paul Smith, Sr. wrote the letter to Plaintiff terminating her employment, and that the letter was on NCDI letterhead.

After being terminated, Plaintiff filed a claim for worker's compensation with the North Carolina Industrial Commission.

**C. Defendants' Disciplinary Policy and Other Employees**

Peters testified that while she worked for NCDI/PSI, the companies had a policy of progressive discipline. Generally, oral discipline was given to an employee first, followed by written discipline, followed by suspension or dismissal.

Plaintiff notes that during the time period of her employment, Defendants used the progressive discipline policy with another technician to deal with the unsatisfactory behavior or violation of company rules. Specifically, Plaintiff notes this other technician received a written warning on November 26, 2006, in the form of a letter for unexcused absences in excess of company policy. This same technician received a verbal warning on December 18, 2006, which was recorded on a "Performance Improvement Plan" in her personnel file, counseling her for poor quality x-rays. Later, on January 24, 2007, this same technician received [*18] a written warning, again recorded on "Performance Improvement Plan" in her personnel file, counseling her for not completing two cases to which she had been dispatched and rescheduling them with facilities without notifying the company.

Defendants do not dispute that this technician had written documentation of her discipline in her personnel file. They note, however, that this technician also eventually filed a workers' compensation claim and her employment was not terminated.

## III. SUMMARY JUDGMENT STANDARD OF REVIEW

*HN1* Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby, 477 U.S. at 255*. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate [*19] that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

*HN2* Where the moving party bears the burden of proof as to an issue, such as an affirmative defense, it "may prevail on its motion for summary judgment and establish an affirmative defense when it has produced credible evidence—using any of the materials specified in *Rule 56(c)*—that would entitle it to a directed verdict at trial." *Brinkley v. Harbour Recreation Club, 180 F.3d 598, 614 (4th Cir. 1999)*(internal quotation marks and citations omitted), *abrogation on other grounds recognized by Hill v. Lockheed Martin Logistics Mgmt, Inc., 354 F.3d 277 (4th Cir. 2004)*. "When the defendant produces such evidence supporting its affirmative defense, the burden of production shifts back to the plaintiff who must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citations omitted).

## IV. SUMMARY JUDGMENT DISCUSSION

*HN3* REDA prohibits discrimination or retaliation against an employee for, among other things, filing or threatening to file, a workers' compensation claim. *N.C. Gen. Stat. § 95-241*. To establish a claim under [*20] REDA, a plaintiff must proffer evidence showing that (1) she exercised her right to engage in an activity protected under the statute; (2) she suffered a retaliatory action, and (3) a causal connection exists between the exercise of the protected activity and the alleged retaliatory action. *Smith v. Computer Task Group, Inc., 568 F.Supp.2d 603, 613 (M.D.N.C. 2008)*(citing *Wiley v. United Parcel Serv., Inc., 164 N.C. App. 183, 186, 594 S.E.2d 809, 811 (2004))*. Under REDA, an employer may assert an affirmative defense by proving "by the greater weight of the evidence that it would have taken the same unfavorable action in the absence of the protected activity of the employee." *N.C. Gen. Stat. § 95-241(b)*.

Here, Defendants contend that Plaintiff has failed to proffer sufficient evidence of a causal connection[1] and that they have shown they would terminated Plaintiff's employment regardless of her work-place injury.

### A. Causal connection element

*HN4* To establish the causation element of a REDA claim, courts have held that a plaintiff may, under certain circumstances, proffer evidence of a "close temporal proximity" between her protected activity and the adverse employment action. *See Smith, 568 F.Supp.2d at 614* (collecting cases). Here, to establish causation, Plaintiff relies in part upon the fact that she was terminated approximately a month after she notified her supervisor that she suffered an on-the-job injury.

While recognizing that temporal proximity-including that of approximately a month—may serve as sufficient evidence of causation, Defendants argue that it cannot suffice in this case. Relying on a decision by the Honorable Terrence Boyle, *Shung-Lung Chao v. Int'l Bus. Mach. Corp., No. 5:09-CV-77-BO, 2010 U.S. Dist. LEXIS 59297, 2010 WL 2465234 (E.D.N.C. June 15, 2010)*, Defendants contend that temporal proximity alone cannot suffice to establish the causation element [*22] of a retaliation claim where an employer contemplates an adverse employment action before an employee engages in protected activity. In *Shung-Lung*, the plaintiff received a very unfavorable year-end performance review by his supervisor. Four weeks after the review, plaintiff's supervisor informed him that his performance remained unacceptable and offered plaintiff the option of accepting a separation package or entering a thirty-day performance improvement plan ("PIP"). *2010 U.S. Dist. LEXIS 59297, 2010 WL 2465234 at * 3*. Three weeks after being placed on the

---

[1] Defendants also argues that Plaintiff "never satisfied the threshold 'condition precedent' in order to trigger the benefits of the [Workers Compensation] Act." To the extent Defendants are contending that Plaintiff failed to file a claim under the act, the record suggests otherwise, [*21] and indeed, Defendants have admitted that she filed a claim. Answer [DE-9] ¶ 27 ("It is admitted that a workers' compensation claim was filed with the North Carolina Industrial commission regarding Roberson's January 24, 2007 injury after she was terminated.").

PIP, the plaintiff complained that his performance evaluation was the result of discrimination. *2010 U.S. Dist. LEXIS 59297, [WL] at \*4*. When Plaintiff later was found not to meet the expectations of the PIP, he was terminated. Judge Boyle, relying on a decision by the Eleventh Circuit Court of Appeals, *Drago v. Jenne, 453 F.3d 1301 (11th Cir. 2006)*, found that under these circumstances, the fact that the plaintiff was terminated after complaining about alleged discrimination did not establish causation. *Id.*

In *Drago*, the Eleventh Circuit found that a plaintiff was unable to present a jury question on the issue of causation because the evidence was "overwhelming" that the employer contemplated **[\*23]** demoting the plaintiff before he ever complained that his rights were being violated. *453 F.3d at 1308*. In that case, a captain in a sheriff's office received repeated criticism for his sub-par presentations to superiors and received a written warning from his superior that he had a five weeks "to effect some drastic change." *Id. at 1303-04*. Two months later, after another deficient presentation, the captain's direct superior told him they needed to meet to discuss the captain's performance deficiencies. Instead of meeting with his superior, the captain left his command. The next day the superior recommended that the captain be demoted for his repeated performance deficiencies and his failure to meet with his superior. Later that day, the superior got in contact with the captain. During their conversation, the captain stated that he needed time off of work. *Id. at 1304*.

The captain did not attempt to return to work until almost two weeks later, and his superiors informed him that he needed a return to work authorization completed by his treating psychiatrist. Two days later, the captain officially returned to work with the completed authorization. On that same day, the captain filed **[\*24]** an internal complaint with the sheriff's department Equal Employment Opportunity office, complaining about his superior's treatment of him. He continued to receive criticism of his performance, and a few months later, was demoted. The captain eventually filed suit alleging retaliation claims under various federal statutes, alleging he was retaliated against for verbally complaining to his superiors about not being able to return to work two days earlier and for filing his EEO complaint.

In finding that the captain failed to create a jury question on the issue of causation, the Eleventh Circuit noted that the captain's demotion occurred approximately three months after he complained to his superiors and filed an EEO complaint. *Id. at 1308*. The court was of the opinion that three months was not "sufficiently proximate to show causation." The Eleventh Circuit then cited the "overwhelming evidence" that the employer was contemplating demoting the captain several months before he engaged in any protected activity. *Id.* The Eleventh Circuit held: "[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity **[\*25]** between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Id.*

This court does not disagree with the holding or rationale of either *Drago* or *Shung-Lung*. The rationale of those two cases, however, is inapplicable to the record before the court. There is not "overwhelming evidence" that Defendants contemplated terminating Plaintiff's employment before she suffered the on-the-job injury. To be sure, Defendants have proffered evidence that Plaintiff had, in their view, performance deficiencies prior to her workplace injury. Defendants have not, however, proffered overwhelming evidence that they specifically contemplated terminating Plaintiff's employment prior to her injury and Defendant's report thereof to the Industrial Commission. Paul Smith, Sr., did testify: "I worked with Trish—if it hadn't been for me, she probably would have been gone a long time before. I worked as hard as I could to keep her because of her loyalty and what she did for me last year." Dep. of Paul Smith, Sr. [DE-67-5] at p. 184. He also answered in the affirmative when Defendants' counsel asked, "[W]hat we have here is I believe your testimony that your brother **[\*26]** at one point wanted to terminate Ms. Roberson, but you thought, 'Well, she's been a good employee in the past so I'm going to give her another chance,' right?" *Id.* at p. 193. It still is unclear from the record however, when exactly Defendants first considered terminating Plaintiff's employment.[2] Nor is there "overwhelming" evidence that Plaintiff's employer contemplated an adverse employment action prior to her injury, in

---

[2] Indeed, some of Paul Smith, Sr.'s testimony casts doubt on Defendant's assertion that they were contemplating terminating Plaintiff's employment long before they had notice of her injury and transmitted paperwork to the Industrial Commission. Paul Smith, Sr., testified that NCDI was being bought by his son "before Ms. Roberson's name even came up about being fired." Dep. of Paul Smith, Sr. [DE-67-5] at p. 178. **[\*27]** He had earlier testified that he "pretty well knew around the end of December, January, sometime in that area" that his son would be purchasing NCDI. Again, this testimony is unclear as to the timing of Defendant's consideration of Plaintiff's termination.

contrast to *Drago* and *Shung-Lung* where the employees specifically had been warned about the prospect of demotion or termination, given written warnings, and placed on PIPs *prior* to the protected activity. In sum, the evidence that Defendants may have contemplated terminating Plaintiff's employment at some unnamed time does not negate, as a matter of law, the temporal proximity evidence.

### B. Affirmative Defense

Defendants contend that, regardless of whether Plaintiff has proffered sufficient evidence to establish her REDA claim, they are entitled to summary judgment on the basis of their affirmative defense. *HN5* Under REDA, an employer bears the burden of persuasion—not just production—of showing that they "would have taken the same unfavorable action in the absence of the protected activity of the employee" under a preponderance standard. *N.C. Gen. Stat. § 95-241(b)*. Here, Defendants argue they would have terminated Plaintiff's employment regardless of whether she filed a workers' compensation claim.

In support of this defense, Defendants point to many reasons for terminating Plaintiff's employment. First, Defendants note Plaintiff walked off the job Christmas Day which could have warranted immediate termination. Second, Defendants assert that Plaintiff began arbitrarily starting her shift later or ending it earlier, resulting [*28] in her failing to work a full shift on ten of her sixteen scheduled days in February. Defendants contend that this created chaos for the dispatch employees as they scrambled to either locate Plaintiff or another technician to cover the scans and try to appease facilities who were requesting scans. Third, Defendants assert Plaintiffs' suboptimal scans and her failure to timely complete calls, even STAT calls, cast their business in a poor light. Finally, Defendants note that having to repeat the suboptimal scans Plaintiff performed cost the business money and at least one customer refused to do business with Defendants because Plaintiff failed to timely complete a STAT scan. Defendants provide ample evidentiary support for each of these proffered reasons.

The court notes that these proffered reasons could be viewed as differing, at least in part, from the original reasons proffered for Plaintiff's termination. As Plaintiff has pointed out, Paul Smith, Sr.'s letter, along with the two enclosures, gave three main reasons for her termination: (1) the audit/evaluation of her work; (2) the memorandum of occurrences (which only referenced one date in February); and (3) leaving early on Christmas [*29] Day. *HN6* In federal discrimination and retaliation cases, courts have held that offering different justifications at different times may be evidence of pretext. *See E.E.O.C. v. Sears Roebuck & Co., 243 F.3d 846, 852-53 (4th Cir. 2001).*[3]

Plaintiff does not appear to factually contest the newly proffered reasons. What she does do, however, is attempt to cast doubt on the idea that these reasons were the *real* driving force behind her termination, noting that many of the examples given by Defendants, such as the Christmas Day incident, occurred prior to her injury, or were part of a pattern of behavior that allegedly began prior to her injury. Plaintiff contends that Defendants never acted upon any of these earlier incidents or perceived performance deficiencies, including never counseling her, verbally or in writing, about these issues. She also notes that her file does not include [*30] any documentation of these performance issues, although at least one other co-worker, during this same time period, received documented verbal and written warnings. She says that under these circumstances, a jury could find that her performance deficiencies?including the Christmas Day incident— became an issue only after she was injured and indicated she would file a workers' compensation claim. She asserts this is especially so considering that another employee received documented verbal and written warnings for the same or similar performance issues during the same time period. *See Abels, 335 N.C. at 217-18, 426 S.E.2d at 826-27* (explaining that *HN7* direct evidence of the employer's state of mind when making the contested employment decision is unlikely, so "evidence of how the employer has treated similarly situated employees in the past and how it was treating them at the time of the discharge" may be "the best indication, other than the testimony of the parties themselves, of the rationale of the employer").

The court agrees. To be sure, Defendants have proffered *compelling* evidence supporting their characterization of Plaintiff's performance deficiencies leading up to her termination [*31] and a jury surely could find that Defendants have proved the affirmative

---

[3] North Carolina courts "'look to federal decision for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases.'" *Abels v. Renfro Corp., 335 N.C. 209, 218, 436 S.E.2d 822, 827 (1993)* (quoting *Dept. of Correction v. Gibson, 308 N.C. 131, 136, 301 S.E.2d 78, 82 (1983)).*

defense under REDA. If the jury believes Plaintiff's testimony, however, it could find that she never received any warnings or counseling regarding these many deficiencies until her termination while another employee—who had not been injured on the job during the same relevant time period— had been given documented written and verbal warnings for similar misconduct. Moreover, a jury could find that Defendants' proffered reasons for the termination are inconsistent with the ones originally give Plaintiff. This, of course, could allow a jury to conclude that Plaintiff's performance deficiencies became an issue only *after* she was injured and indicated she would file a workers' compensation claim. Then again, the jury could find Plaintiff's testimony that she was never warned or counseled leading up to her termination to be not credible, and conclude that her termination was the inevitable result of months of substandard work. This is an issue of fact that cannot be resolved by the court on a motion for summary judgment.

In sum, the issues of whether Plaintiff was terminated because she indicated she would file a workers' [*32] compensation claim, and whether Defendants would have terminated her employment regardless of the filing of any claim, must be decided by the jury in this case.[4] Defendants' Motion for Summary Judgment [DE-66] is DENIED.

**V. MOTION TO SEAL**

Plaintiff moves the court for leave to file certain exhibits to her response to the motion for summary judgment under seal. Specifically, [*33] she seeks leave to file Exhibits 8 [DE-74-1] and Exhibits 11-15 [DE-74-2 through DE-74-6] under seal.

---

[4] The record also indicates that Defendants are of the opinion that any REDA claim against NCDI must be dismissed. Defendants assert that NCDI and PSI did *not* jointly employ Plaintiff, but that in any event, the point is moot because all Defendants are entitled to summary judgment because Plaintiff failed to establish a *prima facie* case. As the court has determined, however, Plaintiff *did* proffer sufficient evidence for her claim.

Neither Defendants nor Plaintiff cite any law in support of their viewpoint on the factual issue of "joint employers" or on the potential legal issue of whether North Carolina recognizes "joint employers" for purposes of a REDA claim. In light of the failure of the parties to cite to persuasive authority, the court declines to rule on the potential factual and legal issue at this juncture.

*HN8* Prior to sealing court documents, a district court must first determine the source of the public's right to access the documents: the common law or the *First Amendment*. *Stone v. Univ. of Md., 855 F.2d 178, 180 (4th Cir. 1988)*. The Fourth Circuit has determined that the *First Amendment* right of access attaches to documents filed in support of a summary judgment motion. *See Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir. 1988)*. Where the *First Amendment* guarantees access to documents, such access "may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Stone, 855 F.2d at 180*.

*HN9* In weighing these competing interests, a court must comply with the procedure set forth by *In re Knight Publishing Company, 743 F.2d 231 (4th Cir. 1984)*. First, a court must give the public notice of a request to seal and a reasonable opportunity to challenge it. *Id.* Although individual notice is not necessary, a court must notify persons present in the courtroom of the request, or docket it "reasonably in advance [*34] of deciding the issue." *Id.* A court must consider less drastic alternatives to sealing, and if it decides to seal documents, it must "state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review." *Id.*

Here, most of the exhibits Plaintiff seeks to seal are confidential medical records subject to the Health Insurance Portability and Accountability Act as codified in *45 CFR 164.501 et seq.* As such, they are not public records and are prohibited from disclosure by federal law. The court finds that as to these exhibits [DE-74-2 through DE-74-6], Plaintiff has met her burden under *In re Knight Publishing* and *Stone*. The motion to seal has been docketed since June 21, 2010, and no opposition to the motion has been filed by a party or non-party despite a reasonable opportunity to do so. Moreover, there is a compelling government interest in protecting medical records that are prohibited from disclosure under federal law, and there appears to be no less drastic alternative to sealing the documents. Consequently, as to exhibits docketed at DE-74-2, DE-74-3, DE-74-4, DE-74-5, and [*35] DE-74-6, the motion is ALLOWED.

As to the exhibit docketed at DE-74-1, however, Plaintiff has not met her burden. The sole reason given for sealing that exhibit is that it consists of personnel records of one of Defendants' employees that have

2:16-cv-03686-DCN     Date Filed 12/15/16     Entry Number 21-8     Page 14 of 17

Page 13 of 16

been identified as "confidential" by Defendants pursuant to the Consequent Qualified Protective Order with Modifications [DE-49]. That, alone, is insufficient to demonstrate a compelling government interest or that sealing the entire document is narrowly tailored to further that interest. *See* In re Red Hat, Inc. Securities Litigation, 261 F.R.D. 83, 94 (E.D.N.C. 2009). Accordingly, the motion is DENIED without prejudice as to the exhibit at DE-74-1. That exhibit, however, will remain under SEAL for fourteen days after the filing of this order, during which time either party may file another motion to seal that complies with applicable Fourth Circuit precedent. If no party files a motion to seal during that time frame, the Clerk of Court is DIRECTED to unseal the exhibit at DE-74-1.[5]

## VI. MOTION FOR ENTRY OF JUDGMENT

Plaintiff, in two separate motions, has requested the court [*36] enter final judgment on all but one of the claims for which she previously accepted offers of judgment made by the Defendants. Defendants oppose the motion.

### A. Applicable Federal Rules of Civil Procedure

At the time Defendants tendered an offer of judgment, **HN10** Rule 68 of the Federal Rules of Civil Procedure provided, in pertinent part, the following:

> **(a) Making an Offer; Judgment on an Accepted Offer.** More than 10 days before the trial begins, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. If, within 10 days after being served, the opposing party serves written notice accepting the offer, either party may then file the offer and notice of acceptance, plus proof of service. The clerk must then enter judgment.

Fed.R.Civ.P. 68(a). "**HN11** The plain purpose of Rule 68 is to encourage settlement and avoid litigation." Marek v. Chesny, 473 U.S. 1, 5, 105 S. Ct. 3012, 87 L. Ed. 2d 1 (1985). Still, as the terms of Rule 68 make clear, not all settlement offers by defendants satisfy Rule 68. Specifically, a Rule 68 "offer is not merely to settle the suit; it must be to permit judgment on specified terms." 12 WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE [*37] & PROCEDURE: CIVIL 2d §3002. Indeed, the Supreme Court explained:

> The critical feature of the Rule is that the offer be one that *allows judgment to be taken against the defendant for both the damages caused by the challenged conduct and the costs then accrued.* In other words, the drafters' concern was not so much with the particular components of offers, but with the *judgments* to be allowed against defendants.

Marek, 473 U.S. at 6 (emphasis in original). *See also* FEDERAL PRACTICE & PROCEDURE § 3002 ("Settlements often do not involve the entry of a judgment against the defendant, as compared to a judgment of dismissal, so that from the plaintiff's perspective the willingness of the defendant to allow judgment to be entered has substantial importance since judgments are enforceable under the power of the court. . . . Thus, Rule 68 comes into play only where a defendant makes an offer not only to settle but to allow judgment.").

**HN12** As the plain terms of Rule 68 make clear, in most instances once a party files both the offer of judgment and the notice of acceptance, along with proof of service, the clerk of court enters judgment, without any further action from the court. Ramming v. Natural Gas Pipeline Co. of America, 390 F.3d 366, 370-71 (5th Cir. 2004). [*38] As at least one other court has recognized, however, Rule 68 is silent as to the effect of an offer of judgment that does not dispose of all the claims in a case. Acceptance Indemn. Ins. Co. v. Southeastern Forge, Inc., 209 F.R.D. 697, 698 n.2 (M.D. Ga. 2002). Some courts are not troubled by this silence, and believe that any accepted offer of judgment—whether it resolves all the claims in the litigation or not—requires the clerk of court to enter judgment. *See* Mallory v. Eyrich, 922 F.2d 1273, 1277-79 (6th Cir. 1991). Other courts, however, believe that when an accepted offer of judgment fails to resolve all claims in a case, Rule 54 of the Federal Rules of Civil Procedure then comes into play. *See, e.g.,* Acceptance Indemnity, 209 F.R.D. at 698 n.2.

**HN13** Rule 54 provides, in pertinent part:

> When an action presents more than one claim for relief . . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all claims or the rights and liabilities of fewer than all parties

---

[5] The original Motion to File Exhibits Under Seal [DE-75] is DENIED as moot.

does [*39] not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). HN14 Interpreting Rule 68 in light of Rule 54, it appears that if an offer of judgment does not include all claims and all parties, it is not automatically self-executing, and the clerk does not automatically enter judgment. Acceptance Indemnity, 209 F.R.D. at 698 n.2. Rather, a court *may*, pursuant to Rule 54(b), direct entry of final judgment as to fewer than all claims.

HN15 Typically, when engaging in a Rule 54(b) analysis, a district court is determining whether "to enter final judgment as to one or more but fewer than all claims in a multiclaim action, thus allowing an appeal on fewer than all claims in a multiclaim action." Braswell Shipyards, Inc. v. Beazer East, Inc., 2 F.3d 1331, 1335 (4th Cir. 1993). In so deciding, a district court first determines "whether the judgment is final . . . in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" Id. (quoting Curtiss-Wright Corp. v. Gen Elec. Co., 446 U.S. 1, 7, 100 S. Ct. 1460, 64 L. Ed. 2d 1 (1980)(quoting [*40] Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436, 76 S. Ct. 895, 100 L. Ed. 1297 (1956))). Then, a court "must determine whether there is no just reason for delay in the entry of judgment." *Id.* The factors a court typically considers when determining the "no just reason" for delay issue include:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of the competing claims, expense, and the like.

Id. at 1335-36 (quoting Allis-Chalmers Corp. v. Philadelphia Elec. Co., 521 F.2d 360, 364 (3d Cir. 1975)). The overarching purpose of this analysis is to "prevent piecemeal appeals." Id. at 1335.

Admittedly, the aforementioned analysis is not entirely applicable to the case before the court because the overarching issue is *not* whether an appeal [*41] may be immediately taken from an order from this court. Nevertheless, both parties utilize this analysis in their briefing. Because it is helpful to the court in framing the current issue, the court will do the same.

**B. Rule 54(b) analysis**

With regard to the first step of the analysis, the parties vigorously dispute whether the accepted offers of judgment are "final judgments." Defendants argue no, contending that the court has not made any "adjudication" of the claims underlying the offer of judgment. Plaintiff, however, argues that the accepted offers of judgment are "final" in that nothing else will be litigated as to the claims. The court agrees with Plaintiff. Although the accepted offers of judgment are not "decisions" of this court, they do serve as the "ultimate disposition of an individual claim entered in the course of a multiple claims action." Curtiss-Wright, 446 U.S. at 7. It is true that the court did not "adjudicate" the claims, but that is because Defendants *offered to have judgment entered against them as to those claims. See, e.g.*, Offer of Judgment [DE-32-1] ("Now come the Defendants . . . pursuant to Rule 68(a) of the Federal Rules of Civil Procedure . . . [and] hereby [*42] jointly offer to allow judgment to be taken against Defendants for Plaintiff's claim of violation of FLSA, 29 U.S.C. § 207(a) . . . ."). By virtue of the Defendants' offers of judgment, and Plaintiff's acceptances thereof, there is nothing left for this court adjudicate with regard to those claims.

The parties also dispute whether Plaintiff has met her burden with regard to the second step of the analysis: whether there is no just reason for delay. Plaintiff, for her part, notes that claims for which she has accepted Defendants' offers of judgment—her claims under Title VII and claims alleging violations of the North Carolina Wage and Hour Act and federal Fair Labor Standards Act—are factually and legally distinct from the sole remaining claim in this action. This of course, is not entirely true: all claims concern the employment of Plaintiff, and one of the Title VII claims concerned the termination of Plaintiff's employment.[6] In any event, as

---

[6] Defendants also take issue with the fact that Plaintiff has *not* moved for entry of final judgment on her acceptance of Defendants' offer of judgment for wrongful discharge in violation of public policy [DE-37], and characterize Plaintiff's decision not to move for entry of final judgment as to this claim "suspect." Plaintiff did not file a reply, so the court does not

Plaintiff notes, any motions for post-judgment relief or appeals from the acceptances of offers of judgment would concern matters totally separate from the merits of the sole remaining REDA claim in this case. *See* 13 MOORE'S FEDERAL PRACTICE § 68-09(noting [*43] that due to "the mandatory nature of *Rule 68(d)*, it is rate that atrial court may appropriately grant relief under *Rule 60(b)* following entry of an accepted *Rule 68* offer, except in narrow circumstances, such as where there was no meeting of the minds as to the offer or mutual assent to the same terms); *id.* at § 68-10 (describing appeals from acceptances of offers under *Rule 68* and noting that most concern whether the offer, acceptance, and judgment satisfy the requirements of *Rule 68*, the interpretation of an offer/acceptance, and the circumstances surrounding the offer/acceptance). Indeed, Plaintiff has demonstrated that fairness dictates that judgment should be entered now. Although Defendants vigorously oppose the entry of final judgment now, they have not articulated any reason why Plaintiff has not satisfied the just reason standard.[7] Defendants may think the amount of the judgments, approximately $10,500.08, is "minimal" and should not be a material consideration, but Plaintiff obviously has a different viewpoint. *See Braswell, 2 F.3d at 1336* (explaining that when determining whether there is no just reason for delay, a court should consider "miscellaneous factors such as delay, [*44] economic and solvency considerations).

As a final point, the court cannot agree with Defendants' overarching theme that Plaintiff's motions for entry [*45] of final judgment are entirely inappropriate and inconsistent with the practice in this district. Most importantly, *HN16* the plain terms of *Rule 68* provides that a defendant may serve on an opposing party an offer to *allow judgment* on specified terms. To be sure, some plaintiffs may find it more expedient to file a stipulation of dismissal as to a claim which has been resolved by an acceptance of an offer of judgment, but that procedure is not dictated by anything in the Federal Rules of Civil Procedure or the Local Civil Rules of this court. Defendants' insistence on that procedure now constitutes an additional condition of settlement which was not present in the original offer of judgment and indeed, appears to not fit logically with the terms of the *Rule 68* itself.

Indeed, it could appear that Defendants are attempting to reap the *benefits* of the rule without fully complying with the burden it also places upon them. As the Sixth Circuit Court of Appeals has explained, *HN17 Rule 68* "has several unique features that distinguish it from other means of compromise and settlement in civil litigation," the most important being "its cost-shifting provision." *Mallory v. Eyrich, 922 F.2d 1273, 1277 (6th Cir. 1991)*. [*46] Under the cost-shifting position, if a plaintiff rejects an offer of judgment, and if she does not ultimately obtain a judgment more favorable than the offer, she must then pay the costs incurred after the offer is made. *Id. at 1277-78*. The cost-shifting provision essentially "shifts the risk of going forward with a lawsuit to the complainant, who becomes exposed to the prospect of being saddled with the substantial expense of trial," and serves as "'the sword which encourages plaintiffs to settle.'" *Id.* (quoting *Hopper v. Euclid Manor Nursing Home, Inc., 867 F.2d 291, 295 (6th Cir. 1989))*. Thus, Defendants apparently want to use the "sword" of *Rule 68* to encourage Plaintiff to settle, but do not want to be held to *their* obligation of allowing judgment to be entered against them. This simply is inequitable.

Consequently, Plaintiff's Motions for entry of final judgment [DE-56; DE-57] are ALLOWED.[8]

### VII. CONCLUSION

For the foregoing reasons, it hereby is ORDERED that:

(1) the Motion for Summary Judgment [DE-66] is DENIED;

(2) the Corrected Motion to File Exhibits Under Seal [DE-76] is ALLOWED as to the exhibits at Docket Entries 74-2 through [*47] 74-6, and DENIED without prejudice as to the exhibit at Docket Entry 74-1;

(3) the Clerk of Court is DIRECTED to maintain the exhibit at Docket Entry 74-1 under SEAL for a period of fourteen days and if no party files a

---

have her interpretation of her decision in front of it. The court can easily see, however, how Plaintiff may have viewed the wrongful discharge claim as being too related to the remaining REDA claim to now move for entry of final judgment. *See Braswell, 2 F.3d at 1335* (noting that the relationship between adjudicated and unadjudicated claims is a factor to consider when determining whether there is no just delay).

[7] Defendants did note that, at the time Plaintiff's motion was filed, the court may rule in their favor on their motion for summary judgment on the sole remaining REDA claim. That, however, has not happened, and Defendants have failed to rebut Plaintiff's showing.

[8] The original motions [DE-52; 54] are DENIED as moot.

motion to seal said exhibit during that time period, the Clerk of Court shall unseal the exhibit;

(4) the Motions for Entry of Final Judgment [DE-56; DE-58] are ALLOWED, and the Clerk is DIRECTED to enter final judgments in the amount of $4,500.04 against Defendants Paul Smith, Sr., and Paul Smith, Jr., on Plaintiff's first, second, and third causes of action in the Amended Complaint (5:07-CV-284-F) [DE-8]; $1,000.02 against Defendants North Carolina Digital Imaging, Inc., and Paul Smith, Inc., on Plaintiff's third cause of action in the Amended Complaint (5:07-CV-284-F) [DE-8]; and $5,000.02 against Defendants North Carolina Digital Imaging, Inc., and Paul Smith, Inc., on Plaintiff's first and second causes of action in the Complaint (5:08-CV-40-F) [DE-1-1];

(5) all other pending motions are DENIED as moot.

SO ORDERED.

This the 18th day of February, 2011.

/s/ James C. Fox

JAMES C. FOX

Senior United States District Judge

## JUDGMENT IN A CIVIL CASE

**Decision by Court.**

**IT IS ORDERED [*48] AND ADJUDGED** that the Motion for Summary Judgment is DENIED. The corrected motion to file exhibits under seal is ALLOWED as to the exhibits at docket entries 74-2 through 74-6, and DENIED without prejudice as to the exhibit at docket entry 74-1. The Clerk of Court is DIRECTED to maintain the exhibit at docket entry 74-1 under SEAL for a period of 14 days and if no party files a motion to seal said exhibit during that time period, the Clerk of Court shall unseal the exhibit.

The Motions for Entry of Final Judgment are ALLOWED and the Clerk is DIRECTED to enter final judgments in the amount of $4,500.04 against Defendants Paul Smith, Sr., and Paul Smith, Jr., on Plaintiff's first, second and third causes of action in the Amended Complaint for (5:07-CV-284-F); $1,000.02 against Defendants North Carolina Digital Imaging, Inc., and Paul Smith, Inc., on Plaintiff's third cause of action in the Amended Complaint in (5:07-CV-284-F); and $5,000.02 against Defendants North Carolina Digital Imaging, Inc., and Paul Smith, Inc. on Plaintiff's first and second causes of action in the Complaint in (5:08-CV-40-F); all other pending motions are DENIED as moot.

THE ABOVE JUDGMENT WAS ENTERED TODAY, **February [*49] 18, 2011**, AND A COPY MAILED VIA ELECTRONICALLY OR BY REGULAR MAIL TO:

John E. Campion (via CM/ECF Notice of Electronic Filing)

Allison Serafin (via CM/ECF Notice of Electronic Filing)

Patricia L. Holland (via CM/ECF Notice of Electronic Filing)

February 18, 2011

Date

*Wilmington, North Carolina*

**End of Document**